A CHILD'S HOPE, LLC, PETITIONER v. JOHN DOE, PERNELL INGRAM AND ANY
UNKNOWN PARENT OR POSSIBLE PARENT, RESPONDENT

No. COA05-679

(Filed 20 June 2006)

**Termination of Parental Rights— illegitimate child—failure to
show assumed burdens of parenthood**

The trial court erred by denying petitioner licensed private
adoption agency's petition to terminate respondent father's
parental rights in light of evidence showing respondent's failure
to meet the requirements of N.C.G.S. § 7B-1111(a)(5), because:
(1) the similarity of the requirements between the statute permit-
ting the termination of a putative father's rights and the statute
requiring the consent of a father of a child born out of wedlock to
its adoption reflect the intent of the legislature not to make an
illegitimate child's future welfare dependent on whether the puta-
tive father knows of the child's existence at the time the petition
is filed; and (2) despite the fact that respondent may have acted
consistently with acknowledging paternity, the trial court failed
to make findings of fact to indicate respondent met the statutory
requirements demonstrating that he assumed some of the bur-
dens of parenthood such as attempting to establish paternity,
legitimizing the child, or providing support for the biological
mother or infant.

Judge JACKSON dissenting.

Appeal by petitioner from order entered 3 December 2004 by
Judge Michael R. Morgan in Wake County District Court. Heard in the
Court of Appeals 8 May 2006.

*Herring McBennett Mills & Finkelstein, PLLC, by Bobby D.
Mills and Anna E. Worley, for petitioner-appellant.*

*No brief filed for respondent-appellee.*

MARTIN, Chief Judge.

Petitioner appeals from the trial court's order denying its petition
to terminate respondent's parental rights to the minor child who is
the subject of this action. For the reasons stated below we reverse
the order of the trial court.

**CHILD'S HOPE, LLC v. DOE**

[178 N.C. App. 96 (2006)]

On 19 August 2002, petitioner, a duly licensed private adoption agency, filed a petition to terminate parental rights pursuant to N.C.G.S. § 7B-1103. Attached to the petition was the affidavit of the biological mother, who averred that on 17 July 2002, she surrendered custody of the minor child to petitioner for an adoptive placement. She stated that she did not know the identity of the minor child's father and that she could not determine his identity or whereabouts. She explained that she was at a party in Chapel Hill, North Carolina on the first weekend of October 2001, where she drank heavily and "may have been drugged." According to her affidavit, when she regained consciousness she had a friend drive her home and the morning after the party she realized that she had been the victim of a rape. She did not file a police report, however, because she went to the hospital to be "checked out" after showering and there was no physical evidence of the rape. She further attested that she did not know the people who gave the party, she attended with someone she had just met, and she used the name "Tiffany" rather than her own. Based upon this affidavit, petitioner published notification in the Chapel Hill newspaper starting on 8 September 2002, notifying any unknown parent of the termination action and of the birth of the minor child.

Respondent is the biological father of the minor child. He testified that he began a romantic relationship with the biological mother, whom he had known for years, in August of 2001, and that when she informed him of her pregnancy he moved back home from college and began working odd jobs and seeking full time employment. He explained that he and the biological mother had discussed baby names and they planned to marry. When respondent informed the biological mother that he was not ready to get married, their relationship deteriorated and the couple stopped seeing one another by February of 2002. Respondent stated that he made his desire to care for the child clear to the biological mother. When she approached him about relinquishing his rights to the child, respondent testified that he informed her that if she did not want the baby he would care for it. The biological mother's response reportedly was that he "would be the last person to get this child." Around 3 June 2002, the biological mother informed respondent that "she had no more baby." He was unclear as to whether the biological mother meant that she had a miscarriage or an abortion, but his mother inquired and was assured that she had a miscarriage.

On 8 January 2003, the petition to terminate unknown fathers' parental rights to the minor child was amended to include respondent. In April 2003, a paternity test showed that respondent was the biological father of the minor child. Respondent moved to dismiss on 29 July 2003 and the case was heard in November 2003. After the hearing, the trial court entered an order with the following pertinent findings of fact:

14. The court further finds that Respondent father was not aware that the minor child was in fact born and survived said birth until January 8, 2003 when he was served a summons along with a petition to appear for a hearing on a Petition to terminate his parental rights and that said unawareness was the result of misrepresentations on the part of the biological mother regarding the whereabouts of the biological father and misrepresentations made to the biological father as to an alleged miscarriage of this child on June 3, 2002;

15. The court further finds that when notified of the pregnancy by the biological mother in October of 2001, the Respondent father withdrew from school and moved back home to Sampson County, North Carolina to care for the minor child;

16. The court further finds that [the biological mother] never told the Respondent that he might not be the father due to an alleged rape that occurred while at a party in October 2001, nor did she inform the Respondent other men may have been the father as through consensual sex;

. . . .

19. The court further finds that the Respondent father continued to prepare to parent the minor child by maintaining consistent contact by phone and in person with the biological mother regarding the progress of the pregnancy, leaving school to return home to care for the child, gaining and maintaining employment, attending a prenatal appointment, caring for [the biological mother]'s other two children so that she could attend other prenatal appointments, engaging in conversations regarding the naming of the child, and purchasing a larger car to transport the child while residing in the home of his mother, stepfather and sister located in Sampson County;

20. The court further finds that the Respondent during this time had, and, [sic] substantial family support in raising the minor

child and providing all necessities with respect to the care of the minor child;

21. The court further finds that said family support and willingness to provide care on the part of the Respondent was corroborated by the testimony of the Respondent's mother . . . and the Respondent's aunt . . . and Melissa Williams of the Johnston County Department of Social Services;

22. That [respondent] informed the biological mother that if she was not willing to provide care for the minor child after it was born, that he would be willing to provide primary care for it. [The biological mother]'s response to the father was that the Respondent would be the last person to care for the child;

23. The court further finds that during the duration of the pregnancy, [the biological mother] would assert that she was predisposed to a miscarriage due to the stress as proven during prior pregnancies;

24. That the court further finds that on or about June 3, 2002, the biological mother informed the Respondent that she miscarried the child and that there was "no child";

25. That the court further finds that the Respondent, upon getting this information as to a miscarriage on June 3, 2002, attempted to verify the truthfulness of the allegations of a miscarriage of the minor child;

. . . .

30. That the court further finds that the respondent father located, via the Internet, a newspaper article printed in the June 4, 2002 News & Observer, which stated that an unidentified baby was abandoned at the Johnston Memorial Hospital during the same weekend that [the biological mother], claimed to have had a miscarriage;

31. That based on the information found in the June 4, 2002 article the Respondent was led to believe that the child referenced in the article was in fact his child born to [the biological mother], that there was no miscarriage and that the child was alive rather than deceased;

32. That the court finds that the Respondent's aunt . . . contacted Johnston Memorial Hospital to determine if [the biological

mother] gave birth to the child or had a miscarriage, but the effort was unsuccessful due to confidentiality concerns on the part of the hospital;

33. That the court finds that the Respondent went to [the biological mother]'s doctor to inquire as to whether [the biological mother] gave birth or had a miscarriage but was unsuccessful due to confidentiality concerns on the part of the doctor;

34. That the court finds that the Respondent went to Johnston County Department of Social Services to inquire about the child referenced in the June 4, 2002 article and to obtain the agency's help in locating a child that may have been born to [the biological mother];

35. That the court finds that Respondent expressed to the Johnston County Department of Social Services a desire to parent the minor child and locate it so that he could provide care;

36. That the court finds that the Respondent agreed to take a paternity test on the child referenced in the June 4, 2002 article, but that the results of the test were that the Respondent was determined not to be the father of that child;

37. That the court finds that the Johnston County [sic] of Social Services at the time of the initial contact with the Respondent knew that he could not be the father of the child in the June 4, 2002, article because of the racial identity of that child but could not immediately inform him of such due to confidentiality concerns;

38. That the court finds that based on the Respondent's report of a missing child possibly born to [the biological mother], the Johnston County Department of Social Services initiated an investigation into a possible investigation [sic] in violation of the law;

39. That the court finds that Ms. Melissa Williams of the Johnston County Department of Social Services made contact with [the biological mother] during which time [the biological mother] denied having sexual intercourse with the Respondent during the time of conception, denied that the Respondent had knowledge of her pregnancy, asserted that the child had already been adopted, asserted further that the child could only have been conceived

during the rape, and denied that she was having consensual sex with others during the time of conception, stating moreover that no one in her family had knowledge of the pregnancy;

40. That the court finds that during the entirety of the pregnancy [the biological mother] concealed her pregnancy from her entire family due to embarrassment that would be caused from having a third child by a third different father;

. . . .

42. That the court further finds that, [the biological mother], in a meeting during the time of the investigation by Ms. Williams, met the Respondent in Johnston County at a local gym and inquired whether he contacted the social services agency about the child and she again asserted that the child was miscarried;

43. That Ms. Williams made contact with the adoption agency in California and the Petitioner during which time Ms. Williams informed them that she had located the father of the child born to [the biological mother].

44. That the adoption agency in California asked Ms. Williams about the racial identity of the Respondent and when told that he was African American the agency informed Ms. Williams that [the biological mother] had told the agency that the father of the child's father [sic] was Hispanic rather than African American;

45. That the court finds that Ms. Williams, due to confidentiality requirements was unable to tell the Respondent that she had located his child, that his child was not miscarried, the location of the child, or anything relating to the adoption of the child or the pending proceeding to terminate the father's parental rights;

46. That the court finds that the Respondent became a party to the action only after Ms. Williams, by way of subpoena from the Petitioner, presented testimony about the results of the investigation and the identity of the Respondent, and that said testimony was presented to the court in December 2003;

. . . .

48. That the court finds that the Respondent took a paternity test in April 2003 establishing that he is the biological father of the minor child;

49. That the court finds that the Respondent has filed a custody action in Johnston County in September 2003 to gain care, custody and control of the minor child;

50. That the court finds that the Respondent filed an action to legitimate the minor child after he learned that the child was in fact born and not miscarried;

The trial court concluded that petitioner "failed to prove by clear, cogent, and convincing evidence that grounds to terminate the parental rights of the respondent father exist pursuant to N.C.G.S. § 7B-1111" and ordered "[t]hat any and all rights of the parental relationship of the biological father and the minor child . . . be maintained, including the obligations of the parent to the child and of the child to the parent arising form [sic] the parental relationship." Petitioner appeals.

The dispositive issue in this appeal is whether the trial court erred by denying the termination petition in light of uncontroverted evidence showing respondent's failure to meet the requirements of N.C.G.S. § 7B-1111(a)(5).

There are two stages to a termination of parental rights proceeding: adjudication, governed by N.C.G.S. § 7B-1109, and disposition, governed by N.C.G.S. § 7B-1110. *In re Brim*, 139 N.C. App. 733, 741, 535 S.E.2d 367, 371 (2000). During the adjudication stage, petitioner has the burden of proof by clear, cogent, and convincing evidence that one or more of the statutory grounds set forth in section 7B-1111 exists. N.C. Gen. Stat. § 7B-1109(e)-(f) (2005). "A finding of any one of the grounds enumerated [in section 7B-1111], if supported by competent evidence, is sufficient to support a termination." *In re J.L.K.*, 165 N.C. App. 311, 317, 598 S.E.2d 387, 391, *disc. review denied*, 359 N.C. 68, 604 S.E.2d 314 (2004). After making a determination that one·of the grounds for termination exists, the trial court proceeds to disposition and considers the best interests of the child. *Id.* The standard of appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law. *In re Huff*, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000), *disc. review denied*, 353 N.C. 374, 547 S.E.2d 9 (2001).

The petitioner filed a petition to terminate the putative father's parental rights pursuant to N.C.G.S. § 7B-1111(a)(5). The statute authorizes the court to terminate parental rights upon a finding that:

The father of a juvenile born out of wedlock has not, *prior to* the filing of a petition or motion to terminate parental rights:

a. Established paternity judicially or by affidavit which has been filed in a central registry maintained by the Department of Health and Human Services; provided, the court shall inquire of the Department of Health and Human Services as to whether such an affidavit has been so filed and shall incorporate into the case record the Department's certified reply; or

b. Legitimated the juvenile pursuant to provisions of G.S. 49-10 or filed a petition for this specific purpose; or

c. Legitimated the juvenile by marriage to the mother of the juvenile; or

d. Provided substantial financial support or consistent care with respect to the juvenile and mother.

N.C. Gen. Stat. § 7B-1111(a)(5) (2005) (emphasis added).

Our Court has previously considered and rejected the argument that a putative father "was unable to take the steps set out in N.C. Gen. Stat. § 7B-1111(a)(5) because he did not know of" the existence of the child. *In re T.L.B.*, 167 N.C. App. 298, 302-03, 605 S.E.2d 249, 252 (2004); *see also In re Adoption of Clark*, 95 N.C. App. 1, 8, 381 S.E.2d 835, 839 (1989) (noting that the predecessor statute to section 7B-1111(a)(5), and the predecessor to N.C.G.S. § 48-3-601(2)(b), contain the same requirements to defeat a petition for termination or to render a putative father's consent unnecessary), *rev'd on other grounds*, 327 N.C. 61, 393 S.E.2d 791 (1990). The similarity of the requirements between the statute permitting the termination of a putative father's rights and the statute requiring the consent of a father of a child born out of wedlock to its adoption reflect the intention of the legislature not to make an "illegitimate child's future welfare dependent on whether or not the putative father knows of the child's existence at the time the petition is filed." *Clark*, 95 N.C. App. at 8, 381 S.E.2d at 839.

Moreover, our Supreme Court has recently re-affirmed the bright line rules regarding putative father's rights established by *In re Adoption of Byrd*, 354 N.C. 188, 552 S.E.2d 142 (2001). *In re Adoption of Anderson*, 360 N.C. 271, 276-78, 624 S.E.2d 626, 629-30 (2006) ("[t]he consent of an unwed putative father . . . is not obligatory

unless he has assumed some of the burdens of parenthood"). In *Byrd*, our Supreme Court noted that the putative father

> did virtually all that could reasonably be expected of any man, . . . [n]evertheless, the statute is clear in its requirements, and respondent must have satisfied the three prerequisites stated, prior to the filing of the adoption petition, in order for his consent to be required. . . . Under the mandate of the statute, a putative father's failure to satisfy any of these requirements before the filing of the adoption petition would render his consent to the adoption unnecessary.

354 N.C. at 194, 552 S.E.2d at 146.

In *Byrd*, the petition was filed the day after the child was born. After stating that a mother should not be "in total control of the adoption to the exclusion of any inherent rights of the biological father", the Court held that despite the putative father's acknowledgment of his paternity, "he did not consistently provide the kind of tangible support required under the statute" prior to the filing of the petition. *Id.* at 196-97, 552 S.E.2d at 148. *Andersen* reiterates our Supreme Court's intention that "biological mothers [should not have] the power to thwart the rights of putative fathers," but holds that "[s]o long as the father makes reasonable and consistent payments *for* the support of mother or child, the mother's refusal to accept assistance cannot defeat his paternal interest." 360 N.C. at 279, 624 S.E.2d at 630 (emphasis in original).

These cases and the statute necessarily establish bright line requirements for putative fathers to demonstrate that they have assumed some of the burdens of parenthood, thus enabling the trial court to make clear factual determinations about their rights. This reflects the need to balance the tensions between paternal rights and the rights of the child. *See Byrd*, 354 N.C. at 196, 552 S.E.2d at 147 ("We recognize the legislature's apparent desire for fatherhood to be acknowledged definitively regardless of biological link. We also recognize the importance of fixing parental responsibility as early as possible for the benefit of the child.").

While we are sympathetic to the dissent's portrayal of the unique facts of this case, the trial court failed to make findings of fact to indicate respondent met the statutory requirements demonstrating that he assumed some of the burdens of parenthood. Based upon respondent's testimony recounting attempts to maintain a relationship with the biological mother and his expressed interest in caring for the

child, the trial court made numerous findings of fact regarding the relationship between the respondent and the biological mother, and her misrepresentations about both the events surrounding the minor child's conception and her "miscarriage." However, despite its lengthy fact-finding, the trial court made no findings of fact as to whether respondent attempted to provide substantial support for the biological mother. The trial court's finding of fact number 19 illustrates that respondent acknowledged paternity, but it does not demonstrate that he provided "substantial financial support or consistent care with respect to the juvenile and mother." Nor are the findings that respondent has substantial family support the equivalent of finding that respondent provided the biological mother with substantial support. *Byrd* at 197, 552 S.E.2d at 148 ("recogniz[ing] the practical importance of family assistance," but holding it insufficient for purposes of the statute).

There is no doubt that the biological mother thwarted respondent's parental rights by lying about the status of the pregnancy; however, when respondent became suspicious, the statute requires that he undertake the steps set forth in section 7B-1111(a)(5) to protect his legal rights. Respondent offered no evidence that he attempted to establish paternity, legitimate the child or provide support for the biological mother or the infant. In addition, the record contains affidavits and photocopies of searches from Courtsearch.com, indicating no records indexed in the names of S.G.R., the biological mother, or respondent, which would exist had a legitimation procedure been filed. It also contains a letter from the Department of Health and Human Services certifying that no affidavit of paternity had been filed in its Central Registry.

Despite the fact that respondent may have acted consistently with acknowledging his paternity, the statute is clear in its requirements, as are *Andersen* and *Byrd*, and the trial court made no findings that respondent, prior to the filing of the termination petition, a) established paternity judicially, b) legitimated the juvenile either through judicial process or c) marriage to the mother, or d) provided the biological mother with substantial financial support or consistent care. The statute is explicit in its requirements and there was no evidence that respondent met those requirements. *See Byrd*, 354 N.C. at 198, 552 S.E.2d at 149 (noting that "[a]ll requirements of the statute must be met" for a putative father's consent to adoption to be required). In fact, there was uncontradicted evidence that the respondent took none of the actions enumerated in section

7B-1111(a)(5). Thus, the trial court's findings do not support its conclusion of law, that petitioner "failed to prove by clear, cogent, and convincing evidence that grounds to terminate the parental rights of the respondent father exist pursuant to N.C.G.S. § 7B-1111," and we must therefore reverse the order of the trial court denying the petition and remand this case for entry of an order consistent with this opinion. Our decision renders unnecessary any discussion of petitioner's remaining assignments of error.

Reversed.

Judge LEVINSON concurs.

Judge JACKSON dissents in a separate opinion.

JACKSON, Judge dissenting.

For the reasons stated below, I respectfully dissent from the majority's conclusion that clear, cogent, and convincing evidence exists to support the termination of respondent's parental rights, and thus the trial court's denial of the petition must be reversed.

As noted by the majority, North Carolina General Statutes, section 7B-1111(a)(5) provides that a putative father's parental rights may be terminated when he has failed to take specific actions prior to the filing of the petition to terminate his parental rights. Prior to the filing of the petition, the putative father must have done one of the following: 1) establish paternity judicially; 2) legitimate the juvenile either through judicial process or by marriage to the mother, or 3) provide the biological mother with substantial financial support or consistent care. The petitioner seeking to terminate the putative father's rights must satisfy the heightened standard of clear, cogent, and convincing evidence to show that facts exist to support a finding that the father has failed to do one of the required actions prior to the filing of the petition.

In the instant case, respondent was purposefully deceived by the biological mother into believing that she had miscarried his child, and that there was, in fact, no baby. Only when he was physically served with the petition to terminate his parental rights to the child did he have any reason to believe that the biological mother actually had given birth to a child. At this point in time, he still did not know that the child was, in fact, his. Thus, respondent could not have legiti-

mated the child or sought to establish paternity of the child prior to the filing of the petition, as the petition was the first actual notice that he had of the existence of the child as noted extensively in the majority's recitation of the facts, *supra.*

The majority relies on the holdings of *In re Adoption of Byrd,* 354 N.C. 188, 552 S.E.2d 142 (2001) and *In re Adoption of Anderson,* 360 N.C. 271, 624 S.E.2d 626 (2006) in its opinion. Although I recognize that this line of cases has established bright line rules regarding the rights of a putative father, I believe that the instant case is distinguishable from both *Byrd* and *Anderson* due to its unique facts. In both *Byrd* and *Anderson,* the putative fathers made offers of support, which subsequently were turned down by the biological mothers. In the instant case, it is undisputed that respondent made drastic changes in his life upon learning of the pregnancy. Respondent's actions from the time he learned of the pregnancy cannot be seen as anything but an acknowledgment of his paternity. When respondent returned home in December following the news of the pregnancy, he worked with his uncle while seeking regular, steady employment. He was not in a position to provide financially for the biological mother, therefore he provided consistent care for her in the only way in which he knew how. He visited her regularly and cared for her children. He made plans for the child's future, which included purchasing a four-door vehicle which would be suitable for transporting a child.

Respondent's relationship with the biological mother continued until the time when the couple decided not to get married, at which point he remained in contact with the mother. He testified that he cared for the biological mother's children on multiple occasions so that she could attend prenatal doctor's visits. When the mother specifically asked respondent to relinquish his rights to the child, he adamantly refused, stating that he would care for the child. Only when the biological mother told respondent that she had miscarried did he stop contacting her. Respondent had no reason to doubt the mother's statements, as her statements remained consistent to him and his family throughout the remainder of the year. Moreover, he took fairly dramatic steps to ensure the veracity of those statements, such as contacting the Johnston County Department of Social Services after learning of the abandonment of a child the same weekend the biological mother informed him she had miscarried, and thereafter agreeing to take a paternity test to conclude whether or not that child was his.

In both *Byrd* and *Anderson*, our Supreme Court held that a biological mother should not be permitted to control the adoption process to the complete exclusion of the biological father. In *Byrd* the Court held that "fundamental fairness dictates that a man should not be held to a standard that produces unreasonable or illogical results. . . . [T]he General Assembly did not intend to place the mother in total control of the adoption to the exclusion of any inherent rights of the biological father." *Byrd*, 354 N.C. at 196, 552 S.E.2d at 147-48. Similarly, in *Anderson* the Court held that "the mother's refusal to accept assistance cannot defeat [a putative father's] paternal interest." *Anderson*, 360 N.C. at 279, 624 S.E.2d at 630. Specifically, its resolution in that case was not intended to "grant biological mothers the power to thwart the rights of putative fathers." *Id.* Thus, to permit a mother purposefully to deceive the biological father regarding the existence of his child, only to then proceed with an adoption of the child, thereby terminating his parental rights based on her deception and lies, seems to be the precise illogical and unreasonable result that our General Assembly intended to avoid, and would, indeed, afford the biological mother prone to such deception the opportunity to "thwart" a putative father as specifically addressed in *Anderson*.

I disagree with the majority's conclusion that respondent failed to comply with the requirements of North Carolina General Statutes, section 7B-1111(a)(5)(d), however. As provided by the statute, the putative father may achieve compliance by providing the mother with substantial financial support <u>or</u> consistent care. N.C. Gen. Stat. § 7B-1111(a)(5)(d). As noted by the trial court in its finding of fact, respondent maintained

> consistent contact by phone and in person with the biological mother regarding the progress of the pregnancy, leaving school to return home to care for the child, gaining and maintaining employment, attending a prenatal appointment, caring for [her] other two children so that she could attend other prenatal appointments, engaging in conversations regarding the naming of the child, and purchasing a larger car to transport the child[.]

Moreover, he informed the biological mother during her pregnancy that he would be willing to provide primary care for the child if she was unwilling to do so. Her response to this proposal was that he would be the last person to care for the child. I believe that these activities are sufficient to satisfy the statutory requirement that a

putative father provide either financial support or consistent care to the biological mother. The trial court's findings also clearly show that even after the putative father had been informed of the miscarriage of his child, he continued to search for that child, hampered by the biological mother's concerted efforts to prevent him from learning of the child's existence and by our state's confidentiality laws. Only after the biological mother engaged in a determined campaign of deception, did respondent cease his efforts to locate his child and provide the mother with care. To argue, as the majority does, that respondent should have filed an affidavit to legitimate an illusory child seems beyond the bounds of what we reasonably may expect of any man.

I note, too, that our interpretation of North Carolina General Statutes, section 7B-1111(a)(5)(d) appears to be a matter of first impression as to the interpretation of the phrase "consistent care." The Court in *Byrd* and *Anderson* upheld the termination of the putative fathers' parental rights through our adoption statutes found in Chapter 48 of the North Carolina General Statutes. In both *Byrd* and *Anderson*, the Court held that due to the putative fathers' failure to provide financial support to the biological mothers, the fathers' consent to the adoptions was not required pursuant to North Carolina General Statutes, section 48-3-601. In the instant case, petitioner sought to terminate respondent's parental rights under the provisions of the Juvenile Code found in Chapter 7B of North Carolina General Statutes, not our state's adoption statutes.

Respondent provided regular and consistent care to the mother throughout her pregnancy, and was deceived intentionally about the birth of the child. In the instant case I believe petitioner has failed to satisfy the standard of clear, cogent, and convincing evidence of respondent's failure to provide consistent care to the mother during her pregnancy. Respondent could not have established paternity or legitimated the child prior to the filing of the petition, as he was lead falsely to believe the child had died. I believe the instant case is distinguishable from the line of cases following *Byrd* and *Anderson*, as respondent was purposefully deceived and was not made aware of the existence of his child until the time he was served with the petition. Therefore, I would affirm the trial court's denial of the petition to terminate respondent's parental rights.