IN THE MATTER OF: M.A.I.B.K.

No. COA07-46

(Filed 19 June 2007)

**1. Termination of Parent Rights— grounds—failure to assume responsibility as father**

The trial court properly found grounds to terminate respondent-father's parental rights in a child born out of wedlock where he took none of the steps required by N.C.G.S. § 7B-111(a)(5) to legitimate the child and to assume his responsibilities as the child's father.

**2. Termination of Parental Rights— decision by same judge who had previously terminated other parent's rights—no error**

There was no error where a judge who had previously terminated a mother's parental rights concluded that it was in the best interest of the child to terminate the father's rights. Nothing suggests reliance by the court upon evidence other than that presented at the father's hearing, and the court was entitled to take judicial notice that the mother's rights had been terminated. Moreover, this district has a Family Court, one of the primary characteristics of which is the assignment of one judge to one family.

Appeal by respondent from order entered 13 October 2006 by Judge Debra Sasser in Wake County District Court. Heard in the Court of Appeals 14 May 2007.

*Wake County Attorney's Office, by Corinne G. Russell, for Wake County Human Services, petitioner-appellee.*

*Poyner & Spruill, LLP, by Bryn Dodge Wilson, for Guardian ad Litem.*

*Annick Lenoir-Peek, for respondent-appellant.*

JACKSON, Judge.

Respondent L.B., father of the minor child M.A.I.B.K., appeals from an order terminating his parental rights. In an opinion filed 6 March 2007, this Court affirmed the termination of the respondent-mother S.K.'s parental rights to the child. *In re M.A.I.B.K.*, 182 N.C. App. 175 LEXIS 482, 641 S.E.2d 417 (2007) (unpublished).

M.A.I.B.K. was born out of wedlock in New York in July 1999, and moved to Wake County, North Carolina with respondent-mother. Wake County Human Services ("DSS") obtained nonsecure custody of the child and placed her in foster care on 1 July 2004, following respondent-mother's incarceration on charges of obtaining property by false pretenses and forgery. At the time of her arrest, the mother was unemployed and homeless. Although she identified respondent-father to DSS as the child's putative father, DSS' attempts to locate him in New York were unavailing.

M.A.I.B.K. was adjudicated a neglected and dependent juvenile on 15 September 2004. On 30 January 2006, DSS filed a petition to ter-

minate both respondents' parental rights, alleging the following two grounds for termination as to respondent-father: (1) that he had neglected M.A.I.B.K., and it was probable that such neglect would be repeated if she were placed in his care, and (2) that M.A.I.B.K. had been born out of wedlock, and respondent-father had not established his paternity judicially or by affidavit filed with the North Carolina Department of Health and Human Services, had not legitimated the child, and had not provided substantial financial support or consistent care for the child or her mother. *See* N.C. Gen. Stat. § 7B-1111(a)(1), (5) (2005). Attached to the petition was an affidavit from the North Carolina Department of Health and Human Services ("NCDHHS"), affirming that "[n]o Affidavit of Paternity has been received from any person acknowledging paternity or purporting to be the father of [M.A.I.B.K.]." The petition was served upon respondent-father by publication, and he appeared at the termination hearing scheduled for 21 June 2006. The trial court granted respondent-father's request for appointed counsel and a continuance to prepare for the proceedings. The trial court then proceeded with respondent-mother's termination hearing, and entered an order terminating her parental rights on 20 July 2006.

The trial court held respondent-father's termination hearing on 20 September 2006. DSS Social Worker Heather Shapiro ("Shapiro"), who had supervised M.A.I.B.K.'s foster care since July of 2004, testified that respondent-father was never married to respondent-mother and had not established his paternity of M.A.I.B.K. or legitimated the child prior to the filing of DSS's petition; nor had an affidavit of paternity been filed with NCDHHS. Respondent-father told Shapiro that he had not seen M.A.I.B.K. since she was two years old, and although he was not "in a position to care for" M.A.I.B.K., he "did have relatives that he wanted to see her placed with possibly." Other than inquiring about the results of the paternity test in July 2006, respondent-father did not contact Shapiro about the child after their initial interview. His friend, Trudy Beamon ("Beamon"), called Shapiro to request a visit with the child while respondent-father and Beamon were in North Carolina for the termination hearing. At no time did respondent-father provide any support for respondent-mother or M.A.I.B.K., and even after learning the results of the paternity test which determined he was the child's father, he made no attempt to communicate with the child. In addition to Shapiro's testimony, the trial court took judicial notice of the order terminating the parental rights of respondent-mother and the prior adjudication of neglect entered on 15 September 2004.

**IN RE M.A.I.B.K.**

[184 N.C. App. 218 (2007)]

Respondent-father testified, *inter alia*, that although respondent-mother told him that he was M.A.I.B.K.'s father within two months of her birth in 1999, he "didn't know for sure one way or the other." He stated that he tried to arrange a paternity test in New York, but that respondent-mother had "just disappeared" with the child. Respondent-father was aware that his friend, William Worth, was in touch with respondent-mother but he made no effort to communicate with her or to ascertain her whereabouts through Worth. In June of 2006, four or five years since his last contact with respondent-mother, respondent-father learned from Worth that "her parental rights were about to be taken from her." After speaking to respondent-mother's attorney, respondent-father obtained a paternity test through DSS in June 2006, and learned conclusively that he was M.A.I.B.K.'s father in July 2006. He acknowledged that he had not established his paternity of M.A.I.B.K. prior to June 2006, and had neither legitimated nor provided any support for the child.

After hearing the parties' evidence, the trial court found each of the grounds for termination as alleged by DSS under section 7B-1111(a)(1) and (5). The court then heard additional testimony from Shapiro, respondent-father, and Beamon regarding the best interests of M.A.I.B.K. The trial court also considered a report on the child's best interests submitted by her guardian ad litem. Based upon the evidence at disposition, the trial court concluded that termination of respondent-father's parental rights would facilitate the permanent placement plan of adoption and would serve the best interests of the child. The order terminating respondent-father's parental rights was entered on 13 October 2006.

We initially note that respondent-father asserts twenty-four assignments of error in the record on appeal. However, respondent-father's brief addresses only eight of the assignments of error. Therefore, the remaining assignments of error for which no argument has been presented are deemed abandoned. N.C. R. App. P. 28(b)(6) (2006).

[1] On appeal, respondent-father asserts that the evidence adduced at the termination hearing was insufficient to support either of the grounds for termination found by the trial court.

At the initial, adjudicatory stage of termination proceedings, the petitioner " 'must show by clear, cogent, and convincing evidence that grounds authorizing the termination of parental rights exist' " under North Carolina General Statutes, section 7B-1111(a). *In re L.A.B.*, 178

IN RE M.A.I.B.K.

[184 N.C. App. 218 (2007)]

N.C. App. 295, 298, 631 S.E.2d 61, 64 (2006) (citation omitted). A finding of any one of the statutory grounds for termination is sufficient. *In re Taylor*, 97 N.C. App. 57, 64, 387 S.E.2d 230, 233-34 (1990). Where, as here, a respondent does not challenge any of the trial court's adjudicatory findings of fact by a properly briefed assignment of error, the findings are deemed to be supported by competent evidence and are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). Therefore, our review is limited to a determination of whether the facts found by the trial court support its conclusion that a ground for termination exists pursuant to section 7B-1111(a). *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997) (citing *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)).

Under North Carolina General Statutes, section 7B-1111(a)(5), the trial court may terminate a father's parental rights if it finds as follows:

The father of a juvenile born out of wedlock has not, prior to the filing of a petition or motion to terminate parental rights:

a. Established paternity judicially or by affidavit which has been filed in a central registry maintained by the Department of Health and Human Services; provided, the court shall inquire of the Department of Health and Human Services as to whether such an affidavit has been so filed and shall incorporate into the case record the Department's certified reply; or

b. Legitimated the juvenile pursuant to provisions of G.S. 49-10 or filed a petition for this specific purpose; or

c. Legitimated the juvenile by marriage to the mother of the juvenile; or

d. Provided substantial financial support or consistent care with respect to the juvenile and mother.

N.C. Gen. Stat. § 7B-1111(a)(5) (2005). In its termination order, the trial court made particularized findings as to M.A.I.B.K.'s out-of-wedlock birth and respondent-father's failure to take *any* of the actions required by this subsection. Rather than contest the sufficiency of the trial court's findings under section 7B-1111(a)(5), respondent-father asserts that the actions of respondent-mother after the birth of M.A.I.B.K. "prevented [him] from taking any of the steps required to

establish paternity" or to provide support and care for the child. While acknowledging the "bright line test" adopted by our courts in interpreting this subsection, he suggests that this Court "should set aside its' [sic] prior line of cases which apply N.C. Gen. Stat. § 7B-1111(a)(5) without consideration for the particular circumstances of each case."

Respondent-father likens his circumstances to that of the father in *A Child's Hope, LLC v. Doe*, 178 N.C. App. 96, 630 S.E.2d 673 (2006), and he argues that, for reasons similar to those stated in the dissent in *A Child's Hope*, we should set aside the bright line test. We find no merit to respondent-father's claim. In *A Child's Hope*, this Court reiterated that the provisions of section 7B-1111(a)(5) are applied strictly, without regard to the respondent-father's knowledge of the minor child:

> Our Court has previously considered and rejected the argument that a putative father "was unable to take the steps set out in N.C. Gen. Stat. § 7B-1111(a)(5) because he did not know of" the existence of the child. The similarity of the requirements between the statute permitting the termination of a putative father's rights and the statute requiring the consent of a father of a child born out of wedlock to its adoption reflect the intention of the legislature not to make an "illegitimate child's future welfare dependent on whether or not the putative father knows of the child's existence at the time the petition is filed."

*Id.* at 103, 630 S.E.2d at 677 (quoting *In re T.L.B.*, 167 N.C. App. 298, 302-03, 605 S.E.2d 249, 252 (2004); citing *In re Adoption of Clark*, 95 N.C. App. 1, 8, 381 S.E.2d 835, 839 (1989), *rev'd on other grounds*, 327 N.C. 61, 393 S.E.2d 791 (1990)). In *A Child's Hope*, we held that the respondent-father's failure to take any of the acts set forth in section 7B-1111(a)(5) required the district court to find grounds for termination thereunder, notwithstanding evidence that the mother hid the child's existence from the father by claiming to have miscarried. *Id.* at 105, 630 S.E.2d at 678. While expressing "no doubt that the biological mother thwarted respondent's parental rights by lying about the status of the pregnancy[,]" this Court concluded that section 7B-1111(a)(5) "is explicit in its requirements and there was no evidence that respondent met those requirements." *Id.* at 105, 630 S.E.2d at 678.

Here, the record is equally clear that respondent-father took none of the steps required by section 7B-1111(a)(5) to assume his respon-

**IN RE M.A.I.B.K.**

[184 N.C. App. 218 (2007)]

sibilities as M.A.I.B.K.'s father. Unlike the father in *A Child's Hope*, respondent-father was aware of his daughter's existence and had been told by the child's mother that he was the father. Respondent-father also saw the child on at least two occasions. Moreover, despite knowing that his friend, William Worth, was in contact with respondent-mother, respondent-father made no attempt to contact her regarding M.A.I.B.K. over a period of almost seven years. In addition, unlike the father in *A Child's Hope*, once respondent-father learned he was the father of M.A.I.B.K., he still took no action to communicate with or provide support for the child. Accordingly, we hold the trial court properly found grounds to terminate respondent-father's parental rights under North Carolina General Statutes, section 7B-1111(a)(5). Because we uphold the court's adjudication under section 7B-1111(a)(5), we need not review the second ground for termination found under section 7B-1111(a)(1). *Taylor*, 97 N.C. App. at 64, 387 S.E.2d at 233-34.

[2] Respondent-father next claims the trial court violated the procedures set forth in North Carolina General Statutes, sections 7B-1109(e) and -1110(a) (2005), by considering M.A.I.B.K.'s best interests prior to adjudicating the existence of grounds to terminate his parental rights. As the basis for this argument, he notes that the trial judge who presided over his termination hearing previously heard evidence and reached conclusions about the best interests of the child in terminating respondent-mother's parental rights on 20 July 2006. Respondent-father suggests that the trial judge's disposition in his case was impermissibly "tainted" by her earlier disposition of the mother's case.

Our Juvenile Code contemplates a two-stage proceeding for the termination of parental rights. *See, e.g., In re White*, 81 N.C. App. 82, 85, 344 S.E.2d 36, 38 (1986) (citing *Montgomery*, 311 N.C. at 110, 316 S.E.2d at 252). During the initial, adjudicatory stage prescribed by section 7B-1109, "[t]he court shall take evidence, find the facts, and shall adjudicate the existence or nonexistence of any of the circumstances set forth in G.S. 7B-1111 which authorize the termination of parental rights of the respondent." N.C. Gen. Stat. § 7B-1109(e) (2005). The second, dispositional stage is governed by North Carolina General Statutes, section 7B-1110, which provides, "[a]fter an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest." N.C. Gen. Stat. § 7B-1110(a) (2005). The trial court need not conduct a separate and distinct hear-

ing for each stage, however, and may hear adjudicatory and dispositional evidence concurrently, provided that it applies the appropriate standard of proof at each stage. *White*, 81 N.C. App. at 85, 344 S.E.2d at 38. Moreover, " '[e]vidence heard or introduced throughout the adjudicatory stage, as well as any additional evidence, may be considered by the court during the dispositional stage.' " *In re J.B.*, 172 N.C. App. 1, 23, 616 S.E.2d 264, 277 (2005) (quoting *In re Blackburn*, 142 N.C. App. 607, 613, 543 S.E.2d 906, 910 (2001)). The trial court's determination of a child's best interests at disposition is reviewed only for an abuse of discretion. *Id.* at 24, 616 S.E.2d at 278 (citing *In re Nolen*, 117 N.C. App. 693, 700, 453 S.E.2d 220, 225 (1995)).

We find no error in the procedures employed by the trial court in the instant case. While not required to do so, the trial court conducted a separate dispositional hearing after adjudicating the existence of grounds for termination of respondent-father's rights. Nothing in the trial court's dispositional findings and conclusions suggests its reliance upon any evidence other than what was presented by the parties at the hearing for respondent-father. Moreover, in evaluating the best interests of M.A.I.B.K., the trial court was entitled to take judicial notice that the respondent-mother's parental rights also had been terminated. *See generally J.B.*, 172 N.C. App. at 16, 616 S.E.2d at 273 (" 'A trial court may take judicial notice of earlier proceedings in the same cause.' ") (quoting *In re Isenhour*, 101 N.C. App. 550, 553, 400 S.E.2d 71, 73 (1991)). Respondent-father cites no authority that would bar a trial judge from presiding in an action to terminate the parental rights of one parent of a child simply because the judge previously has terminated the rights of the other parent. *See* N.C. R. App. P. 28(b)(6) (2006).

In addition, we note that the Tenth Judicial District has a specialized division of the District Court known as Family Court. The Family Court program began with a pilot program in three judicial districts in 1999, and the Administrative Office of the Courts has since expanded the Family Court program to eleven judicial districts in North Carolina. One of the primary characteristics of the Family Court is its "one judge, one family" policy. This policy is "[o]ften cited as the most critical component of any successful family court," as it helps "avoid the fragmentation, the duplication of effort and expense, and the potential for conflicting court orders" in a domestic case. Cheryl Daniels Howell, *North Carolina's Experiment with Family Court*, Popular Gov't, Summer 2000, at 15, 18.

**IN RE M.A.I.B.K.**

[184 N.C. App. 218 (2007)]

Pursuant to the authority granted by North Carolina General Statutes, section 7A-146,[1] the Tenth Judicial District has adopted local rules which govern its juvenile Family Court cases. These rules require judicial assignment of one judge to each juvenile's case. Specifically, Rule 19.1 of the Tenth Judicial District Juvenile Abuse/Neglect/Dependency Court Rules, which became effective 15 February 2006, provides as follows:

19.1 Judicial Assignment upon Adjudication.

Once a juvenile case involving allegations of abuse, neglect, or dependency has been adjudicated, that case shall be assigned to the judge presiding over the Adjudication/Disposition hearing. All subsequent hearings in the case shall be scheduled before the same judge, including Termination of Parental Rights hearings and future adjudications regarding the same juvenile(s), unless extraordinary circumstances require otherwise.

10th Jud. Dist. Juv. Abuse/Neglect/Dependency Ct. R. 19.1 (Feb. 15, 2006).

The petition for termination of parental rights in this case was filed just prior to the effective date for Rule 19.1, but this Rule was in effect at the time of the termination of parental rights hearings of both the mother and respondent-father. Therefore, Judge Sasser, as the assigned judge in juvenile court, was required pursuant to Rule 19.1 to hear all juvenile matters involving M.A.I.B.K., "unless extraordinary circumstances require[d] otherwise." *Id.* Respondent-father has not argued any extraordinary circumstances in this case which would call for removal or recusal of the assigned judge. The fact that the assigned judge would have heard other matters involving the par-

---

1. North Carolina General Statutes, section 7A-146 (2005) states in pertinent part:

The chief district judge, subject to the general supervision of the Chief Justice of the Supreme Court, has administrative supervision and authority over the operation of the district courts and magistrates in [her] district. These powers and duties include, but are not limited to, the following:

(1) Arranging schedules and assigning district judges for sessions of district courts;

(2) Arranging or supervising the calendaring of noncriminal matters for trial or hearing;

. . .

(7) Arranging sessions, to the extent practicable for the trial of specialized cases, including traffic, domestic relations, and other types of cases, and assigning district judges to preside over these sessions so as to permit maximum practicable specialization by individual judges . . . .

**IN RE M.A.I.B.K.**

[184 N.C. App. 218 (2007)]

ticular child and/or family is entirely appropriate in juvenile Family Court cases such as this one.

As further support for his claim that the trial court pre-judged the issue of M.A.I.B.K.'s best interests, respondent-father contends the "only findings of facts which refer to [him]" on the issue of M.A.I.B.K.'s best interests are the following:

39. That it is in the best interests of M.A.I.B.K. that the rights of the father, [L.B.], be terminated.

. . . .

41. That the conduct of the father . . . has been such as to demonstrate that he will not promote the healthy and orderly, physical and emotional well being of the child, M.A.I.B.K.

42. That the minor child, M.A.I.B.K., is in need of a permanent plan of care at the earliest possible age which can be obtained only by the severing of the relationship between the child and her father, and by termination of the parental rights of the father[.]

43. That it is in the best interests of the child, M.A.I.B.K., that the parental rights of the father . . . be terminated.

Respondent-father contends these findings "are not supported by competent evidence" and are mere reiterations of conclusions of law appearing elsewhere in the order.

Again, we find no merit to this claim. Regarding the quantity of the trial court's findings on the child's best interests *vis a vis* respondent-father, we note that he fails to reckon with the following uncontested findings pertinent to the issue:

18. That when the child was born, the father believed, but was not 100% sure, that he was the father of the child.

19. That the father last saw the child when she was two and a half years old.

. . . .

21. That when the mother left with the child the father took no steps to find the child or the child's mother.

22. That the father and mother have, and have had since the birth of the child, a mutual acquaintance in the child's god-father[, Worth].

23. That after the mother left with the child, the father was aware the mother occasionally contacted [Worth].

24. That the father never asked [Worth] if he knew the where-abouts of the mother or the child; the father did not ask [Worth] to relay messages to the mother or the child; and the father took no steps to utilize [Worth] as a way to look for the child.

25. That the father has not legitimated the child by statute or through marriage.

26. That the father has provided no financial support for the child during her life.

27. That the father did not establish paternity for the child prior to the filing of the petition to terminate parental rights.

28. That the father's first appearance in this matter was at a hear-ing initially held on June 21, 2006. The father met with the social worker at this time. He told the social worker that he is not in a position to care for the child in the future, but wants her to live with family in New York.

29. That since that date the father has not traveled to North Carolina to visit with the child. The father did not send the child any cards or gifts. He did not request a visit until, through his companion, he requested to see the child while he was in town for today's hearing.

. . . .

31. That the permanent plan for M.A.I.B.K. is adoption. The agency at this time is looking at the foster parent who is in-terested in adopting.

32. That a child needs stability and needs a safe and secure sense of belonging in order to develop a healthy life. It is not a safe, permanent plan for a child to be in limbo in foster care . . . .

33. That the child has been placed with the current foster par-ent[] since she has been in care and has developed a strong bond with her. M.A.I.B.K. also has a strong bond with the fos-ter parent's extended family.

34. That M.A.I.B.K. is a very adoptable child. She is articulate, intelligent, outgoing, beautiful, has no behavior issues and does well in school.

35. That M.A.I.B.K. and her father have no bond.

36. That M.A.I.B.K. turned seven years of age . . ., and the likelihood of her adoption appears great.

*See* N.C. Gen. Stat. § 1110(a)(1)-(6) (2005). Moreover, we find ample support for findings of fact 39, and 41-43 in the testimony of Shapiro and respondent-father, and the guardian ad litem's report. The report noted respondent-father's failure to provide the guardian ad litem with promised documentation regarding his criminal and employment histories, housing, and other information pertinent to his ability to care for a child. It also noted that he "made no efforts to acknowledge [M.A.I.B.K.'s] birthday in mid July or to request [] visits or phone call privileges." The report advised the trial court that M.A.I.B.K. "continues to thrive in her original foster care placement" and "is very bonded with her foster mother." The foster mother was described as "anxious to take permanent custody of [M.A.I.B.K.] if [] she becomes free for adoption." The guardian ad litem portrayed M.A.I.B.K. as having experienced "a tremendous amount of grief, loss and stress in her short life[,]" pointing specifically to her loss of respondent-mother after five "very chaotic" years in her care. She concluded her report as follows:

> M.A.I.B.K. needs a stable nurturing permanent home. . . . It is apparent that [she] is doing very well and feels safe and secure in her present home. This Guardian feels that [it] is in the best interest of M.A.I.B.K. to be adopted by her current foster parent.

Finally, although the determination of a child's best interests is in the nature of a conclusion of law rather than pure fact-finding, *see Helms*, 127 N.C. App. at 511, 491 S.E.2d at 676, we hold the trial court's conclusion to be fully supported by its findings of fact and the evidence presented at the hearing. Respondent-father's final assignment of error is overruled.

Affirmed.

Judges STEPHENS and STROUD concur.