692 S.E.2d 158 (2010)
In re A.C.V.
No. COA09-1199.
Court of Appeals of North Carolina.
April 20, 2010.
*160 Herring Mills & Kratt, PLLC, by Donna A. Hart and Bobby D. Mills, Raleigh, for petitioner-appellee.
Mercedes O. Chut, Greensboro, for respondent-father appellant.
HUNTER, JR., ROBERT N., Judge.
The trial court terminated respondent-father's ("Joe's")[1] parental rights to A.C.V. ("Austin") on 20 May 2009 pursuant to N.C. Gen.Stat. § 7B-1111(a)(5) (2009). Joe appeals and argues: (1) insufficient competent evidence was presented at trial to support certain findings of fact made by the trial court; (2) the trial court erred in exercising subject matter jurisdiction over the termination action; and (3) the trial court erred in concluding that a ground exists to terminate Joe's parental rights. We affirm the trial court's order.

Background
In 2007, Joe began dating Austin's mother ("Jan") when they were both sixteen and in high school. Joe and Jan confirmed that Jan was about three months pregnant in September 2007, and Joe and Jan's families met to discuss the situation shortly thereafter. During this meeting, Jan's father, "Roger," informed Joe that he needed to take care of Jan and the child. Roger recounted their conversation at trial:
[T]oward the end [of the meeting] I wanted to make sure [Joe]we didn't have any problem with one another, and so I pulled my chair up right in front of his face. He was on the recliner and I pulled up on the recliner stool and got three inches from his face and made sure the interpreterI said, "Make sure [Joe's] dad understands what I'm saying," and I looked at [Joe] and said, "You need to step up and do the right thing and take care of this baby and-and my daughter. You're going to have to get you a job, got to work, and do the right thing. If you don't, I'm gonna [sic] be mad. And youand it starts from right now. She's got doctor's visits. She's going to have to pay the gas to get there. We've gotta [sic] pay the co-pay, so I need money," um, "It ain't got nothing to do the baby's not here, but I need money now[.]
After this meeting, Joe and Jan continued to see each other at school, and dated through the fall of 2007. Jan's parents arranged for the couple to take parenting classes at the YMCA. In February 2008, Jan and her parents invited Joe to dinner, and they informed Joe that Jan would spend the duration of her pregnancy at a maternity home. Around Easter 2008, Jan decided to put Austin up for adoption, and Joe was informed of this decision on 1 April 2008. Austin was born on 14 April 2008.
On 16 April 2008, petitioner, Amazing Grace Adoptions ("Amazing Grace"), a licensed private adoption agency, filed a petition to terminate Joe's parental rights pursuant to N.C. Gen.Stat. § 7B-1103 (2009). Amazing Grace stated that Austin had been surrendered to Amazing Grace for adoption by Jan on 15 April 2008. Attached to the petition was an affidavit of parentage signed by Jan and identifying Joe as Austin's father. Also attached was a "Relinquishment of Minor for Adoption by Parent or Guardian," which was executed by Jan, as well as an acceptance of the relinquishment by Amazing Grace.
In the petition, Amazing Grace alleged that Jan had indicated the following:
[T]he birth father is 16 years of age; that he is the only one that she had sexual intercourse with in the summer of [omitted] when the child could have been conceived; that he is aware of the pregnancy; that she has not married the Respondent...; that she has not received any financial support for the baby or consistent physical care for the baby from Respondent..., and has not received any legal notice that he has filed any actions to acknowledge paternity or otherwise legitimate the child. Upon information and belief he went with her to several pregnancy meetings at the local YMCA in the early stages of her pregnancy. Upon information and belief he is aware of the adoptive plan. *161 Amazing Grace averred in the petition that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(5) to terminate Joe's parental rights, in that Joe had failed to provide adequate support to Jan during the pregnancy.
On 25 July 2008, Joe filed an answer to the petition. Joe admitted that he was aware of the pregnancy, he did not marry the mother, and he did not file any action or legal notice to legitimize the child. However, Joe stated in opposition to the petition that he "was never given the opportunity to care for the child despite [Joe] and his parents telling the mother and her parents that he was against adoption and wanted to care for his child." Joe further stated that he "was unaware he could file legal documents legitimizing the baby."
Hearings were held on the petition to terminate Joe's parental rights on 24 April 2009 and 20 May 2009. The trial court concluded that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(5) to terminate Joe's parental rights, because Joe had not provided support to Jan during the pregnancy and Joe had failed to satisfy the other requirements of section 7B-1111 (a)(5). The court further concluded that it was in Austin's best interests that Joe's parental rights be terminated. Joe appeals the trial court's order.

Analysis

I.
Joe contends that many of the trial court's findings are not supported by competent evidence. We disagree.
This Court reviews the adjudicatory phase in a termination of parental rights case to determine "whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law." In re Shermer, 156 N.C.App. 281, 285, 576 S.E.2d 403, 406 (2003). "So long as the findings of fact support a conclusion [that at least one ground in section 7B-1111(a) is satisfied], the order terminating parental rights must be affirmed." In re Oghenekevebe, 123 N.C.App. 434, 436, 473 S.E.2d 393, 395 (1996). "If there is competent evidence to support the trial court's findings of fact and conclusions of law, the same are binding on appeal even in the presence of evidence to the contrary." Id. at 439, 473 S.E.2d at 397-98.
In its order, the trial court held that Amazing Grace satisfied the requirements of N.C.G.S. § 7B-1111(a)(5) in finding that a ground exists to terminate Joe's parental rights. This section of our General Statutes provides that parental rights may be terminated upon a finding that:
(5) The father of a juvenile born out of wedlock has not, prior to the filing of a petition or motion to terminate parental rights:
a. Established paternity judicially or by affidavit which has been filed in a central registry maintained by the Department of Health and Human Services; . . . or
b. Legitimated the juvenile pursuant to provisions of G.S. 49-10 or filed a petition for this specific purpose; or
c. Legitimated the juvenile by marriage to the mother of the juvenile; or
d. Provided substantial financial support or consistent care with respect to the juvenile and mother.
N.C.G.S. § 7B-1111(a)(5). In this case, all of the findings in the trial court's order focus on subsection (d) of N.C.G.S. § 7B-1111(a)(5), because Joe failed to satisfy the bright line requirements of subsections (a) through (c).
In contravention of many of the trial court's numerous findings now challenged, Joe contends that he provided to Austin, in utero, and Jan, during pregnancy, "substantial financial support or consistent care" by: (1) Joe's parents renting a larger home with sufficient room to house Austin when he was born; (2) saving money for the baby; (3) buying baby supplies, including "a stroller, crib, playpen, toys, clothing and washtub"; (4) having some social contact, including phone calls with Jan through the pregnancy; (5) attending one ultrasound appointment; and (6) attending four or five YWCA parenting classes after he was made aware that Jan was going to the classes.
*162 Joe testified that when he informed Jan that he had some items for the baby, Jan told him that she already had a plentiful amount of similar items. Joe kept the items at home as a result. Joe also claims that Roger inhibited his ability to provide more support to Jan by withholding contact information from Joe when Jan left to reside at the maternity home for the remainder of the pregnancy. Roger contradicted Joe's testimony at trial, and stated instead that he had, in fact, helped Jan place Joe's name on the approved visitors' list and had offered to give Joe Jan's contact information at the maternity home. Joe did not reach Roger for that information until just prior to Austin's birth. Roger also testified that, from his perspective, Joe was not actively involved in helping with the pregnancy, despite his own efforts to include Joe in the process.
Joe presents his version of the facts on appeal in an effort to challenge 89 of the trial court's 123 findings of fact as to whether he provided "substantial financial support or consistent care" during Jan's pregnancy under section 7B-1111(a)(5). Joe contends that when evidence favorable to him is compared to the trial court's findings, it is apparent that each finding is not supported by adequate competent evidence in the record. We need not address each challenged finding individually, however, because the evidence offered by Joe shows that no direct support was given to Jan or the baby during the pregnancy.
We note that the terms "substantial financial support" and "consistent care" are not defined within Chapter 7B of our General Statutes. However, in this case, we think it is reasonable to conclude that such language in the statute requires, at a minimum, that Joe should have involved himself to the extent Roger requested at the families' meeting in the fall of 2007: gas money, doctor co-pay reimbursement, and general financial support during Jan's pregnancy. Nothing in Joe's version of the facts shows that either he, or his family,[2] provided this sort of financial support directly to Jan and Austin during gestation.
These facts are analogous to those presented in A Child's Hope, LLC v. Doe, 178 N.C.App. 96, 630 S.E.2d 673 (2006). In A Child's Hope, this Court reversed an order finding that A Child's Hope, LLC, an adoption agency, had failed to show that it satisfied its burden under section 7B-1111(a)(5); even though the facts tended to show that the putative father did not discover the existence of his biological status as the child's father until after the birth of the child. A Child's Hope, 178 N.C.App. at 105, 630 S.E.2d at 678. The putative father's knowledge was delayed due to the biological mother informing the putative father that she had miscarried instead of delivering the child. Id. This Court reversed the order keeping intact the putative father's parental rights, because, even though the putative father was entirely unaware of his child's existence until he was served with a summons to terminate his rights, the father did not legitimate or support the mother or child in accordance with section 7B-1111(a)(5). Id. at 105-06, 630 S.E.2d at 678-79. In so holding, a majority of this Court wrote that section 7B-1111(a)(5) "is explicit in its requirements and there was no evidence that respondent met those requirements." Id. at 105, 630 S.E.2d at 678.
Here, unlike A Child's Hope, Joe was aware that Jan was pregnant, and should have been aware that Jan needed more "care" than a few phone calls, more baby clothes, or attendance at a few classes or one ultrasound. The word "consistent" means with "regularity, or steady continuity throughout: showing no significant change, unevenness, or contradiction." Webster's Third New International Dictionary Unabridged 484 (1976). Thus, even viewing Joe's facts in a light most favorable to him, the strict statutory requirements of section 7B-1111(a)(5), as we have interpreted in A Child's Hope, have not been met.
*163 Because Joe's presentation of the facts fail to satisfy the requirements of our statute, we conclude that Finding of Fact 107 providing that Joe failed to meet the requirements of section 7B-1111(a)(5) is supported by clear, cogent, and convincing evidence. These assignments of error are overruled.

II.
Next, Joe argues that Amazing Grace lacked standing to file the petition to terminate his parental rights, and contends that Jan's relinquishment alone was insufficient to confer standing upon Amazing Grace. Joe claims that pursuant to N.C. Gen.Stat. § 48-3-601 (2009) and 48-3-701 (2009), his consent to adoption was necessary in order to confer standing. We disagree.
"Standing is jurisdictional in nature and `[c]onsequently, standing is a threshold issue that must be addressed, and found to exist, before the merits of [the] case are judicially resolved.'" In re Miller, 162 N.C.App. 355, 357, 590 S.E.2d 864, 865 (2004) (citation omitted). In North Carolina, standing to file a petition to terminate parental rights is prescribed by N.C. Gen.Stat. § 7B-1103, which provides that any "licensed child-placing agency to which the juvenile has been surrendered for adoption by one of the parents or by the guardian of the person of the juvenile, pursuant to G.S. 48-3-701" has standing to file a petition to terminate parental rights. N.C. Gen.Stat. § 7B-1103(a)(4) (emphasis added). Section 48-3-701(b) provides that "[t]he mother of a minor child may execute a relinquishment at any time after the child is born but not sooner. A man whose consent is required under G.S. 48-3-601 may execute a relinquishment either before or after the child is born." N.C.G.S. § 48-3-701(b). In accordance with N.C. Gen.Stat. § 48-3-601, "a man must before the earlier of the filing of the adoption petition or the date of the hearing provide reasonable and consistent payments for the support of (1) the biological mother during her pregnancy, (2) the minor, or (3) both the biological mother and the minor." In re Adoption of Byrd, 137 N.C.App. 623, 631, 529 S.E.2d 465, 471 (2000) (citing N.C. Gen.Stat. § 48-3-601(b)(4)(II)), aff'd, 354 N.C. 188, 552 S.E.2d 142 (2001).
Joe argues that the trial court erred in failing to determine whether his consent to adoption was required under N.C. Gen.Stat. § 48-3-601. Joe contends that if his consent was needed, then Jan's relinquishment alone was insufficient to confer standing upon Amazing Grace. Regarding the requirements, Joe argues that because no adoption petition had been filed at the time of the termination hearing, consideration of whether he had supported the mother and child was premature. Joe further asserts that, because he complied with the statutory requirements of acknowledgment of paternity and communication with the mother, his consent to adoption was required.
Despite Joe's contentions, N.C.G.S. §§ 48-3-601 and -701 create no further burden on Amazing Grace, other than a timely relinquishment by a parent or guardian, in order to establish standing. Section 48-3-601 solely concerns the circumstances under which a person's consent to adoption is required. Section 48-3-701 solely concerns the timing of a relinquishment by a parent or guardian. Here, Jan executed a timely relinquishment in accordance with N.C.G.S. § 48-3-701. Accordingly, we conclude Jan's timely relinquishment was sufficient to confer standing upon Amazing Grace.
Joe further asserts that, even assuming arguendo that his consent was not required, Amazing Grace lacked standing because it never introduced Jan's relinquishment into evidence. We find Joe's contention to be without merit. In order to confer jurisdiction on the trial court, a juvenile petition must state "[t]he name and address of the petitioner or movant and facts sufficient to identify the petitioner or movant as one authorized by [N.C. Gen.Stat. §] 7B-1103 to file a petition or motion." N.C. Gen.Stat. § 7B-1104(2) (2009). Here, Amazing Grace alleged that Jan had surrendered the child to Amazing Grace, and a notarized copy of the relinquishment was attached to the petition. Thus, we conclude Amazing Grace alleged sufficient facts to establish its standing.

*164 III.
We next consider Joe's argument that the trial court erred by concluding that grounds existed pursuant to N.C. Gen.Stat. § 7B-1111(a)(5) to terminate his parental rights.
At the outset, we note that we have already concluded that the trial court's finding that Joe failed to comply with section 7B-1111(a)(5) is supported by clear, cogent, and convincing evidence. Since this finding unquestioningly supports the trial court's conclusion that a ground exists to terminate Joe's parental rights under our statutes, the trial court's conclusion of law to this effect must be affirmed under our standard of review. In re Shermer, 156 N.C.App. at 285, 576 S.E.2d at 406; In re Oghenekevebe, 123 N.C.App. at 435-36, 473 S.E.2d at 395. Therefore, Joe's contention that he could not comply with section 7B-1111(a)(5) due to his status as a minor need not be addressed, because our prior discussion of the trial court's findings demonstrates that either Joe or his family could have provided at least some direct support to Jan, and the record is devoid of any evidence showing that this occurred.
However, Joe also argues that the trial court erred in failing to find that Joe is unfit to be a parent or that Joe has neglected Austin. In citing Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), Joe claims that absent these findings, his rights have been terminated without sufficient due process.
Protection of the family unit is an absolute right guaranteed by the Due Process and Equal Protection clauses of the Fourteenth Amendment and the Ninth Amendment of the United States Constitution. Owenby v. Young, 357 N.C. 142, 145, 579 S.E.2d 264, 266 (2003) (citing Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Courts in this State have long held that this right will remain undisturbed "absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children[.]" Petersen v. Rogers, 337 N.C. 397, 403-04, 445 S.E.2d 901, 905 (1994). "Th[is] protected liberty interest complements the responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child." Owenby, 357 N.C. at 145, 579 S.E.2d at 266. However, this presumption is erased where a parent "fails to shoulder the responsibilities that are attendant to rearing a child." Price v. Howard, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997).
In Owenby, the North Carolina Supreme Court noted that a finding under any of the provisions in section 7B-1111 will result in a parent "forfeit[ing] his or her constitutionally protected status." Owenby, 357 N.C. at 145, 579 S.E.2d at 267. When the protection of the parental presumption is lost, the trial court may then ask the lower threshold question of what is the "best interest of the child." Id. at 146, 579 S.E.2d at 267.
Cases such as this and A Child's Hope demonstrate what appears to be an underlying tension between the constitutional rights of putative fathers and the requisites of section 7B-1111(a)(5) as this State's appellate courts have interpreted it. Indeed, with respect to its application of section 7B-1111(a)(5), the trial court here accurately noted:
[O]ur appellate courts have interpreted Chapter § 7B harshly. And I am compelled to follow their decisions by my oath and until the law is changed[.][I]t is highly unlikely that any putative father can take some of the steps in § 1111(a)(5) prior to the filing of a Petition for the Termination of his Parental Rights.
In summarizing its impression of Joe, the trial court further stated:
[T]his courtroom, on most days of the week, has parents who are not half the parent that you [Joe] are and the irony is that-that you're a child. . . . I think you always wanted to be part of your son's life. I agree about the housing, [and] the supplies [and] that you have sent some money.
These statements by the trial court concerning Joe and Chapter 7B aside, we believe that Owenby controls Joe's due process argument, and we are thus bound by precedent to acknowledge that Joe's constitutionally protected status as Austin's natural parent was properly removed by the trial court. Therefore, *165 the trial court's application of the best interests test was appropriate.
However, we observe that one of the purposes of Chapter 7B, as provided in section 7B-100, is "[t]o provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents[.]" N.C. Gen.Stat. § 7B-100(1) (2009) (emphasis added). It is difficult, under the circumstances of this case, to conclude that Joe's constitutional rights were assured[3] through the application of section 7B-1111(a)(5)particularly in light of the procedures mandated for minors in cases of abused, neglected, or dependent children pursuant to N.C. Gen.Stat. §§ 7B-401,-503 (2009).
Under these procedures, if a request for nonsecure custody is made, a far less permanent placement than adoption, the trial court is first required to consider the release of a child to the "juvenile's parent, relative, guardian, custodian, or other responsible adult." N.C. Gen.Stat. § 7B-503(a) (2009). The adoption procedures used here under Chapter 48, as reflected in the outcome of this case and A Child's Hope, has no similar mechanism for assuring that the constitutional protections guaranteed to a putative father are protected.
Of the 123 findings made by the trial court in its order terminating Joe's rights, not one claims that Joe was unfit to be a parent or that Joe's family's home was unsuitable to house a child. Austin was born, given to an adoptive family the next day, and left with the adoptive family for over a year prior to the termination of parental rights hearing in this case. As a practical matter, a litigant in Joe's position is never offered the opportunity to raise his or her own child through this application of Chapter 48. Furthermore, temporarily placing a child with an adoptive family before the father has been able to demonstrate that he is capable of maintaining a familial relationship appears to provide unequal treatment to a father of a newborn as opposed to the father of an abused, neglected, and dependent child. Nevertheless, based on Owenby and A Child's Hope, these assignments of error are overruled.
Affirmed.
Judge BEASLEY, concurs.
Judge WYNN concurs in the result with separate concurring opinion.
WYNN, Judge, concurring in result.
The majority opinion notes that "[i]t is difficult, under the circumstances of this case, to conclude that [the Respondent-father's] constitutional rights were assured through the application of section 7B-1111(a)(5)." I write separately to point out that we do not reach the constitutional issue because, under North Carolina law, the biological father in this case did not demonstrate his entitlement to the constitutionally protected status of a parent.
It is well settled that "the protection of the family unit is guaranteed not only by the Due Process Clause, but also by the Equal Protection Clause of the Fourteenth Amendment and possibly by the Ninth Amendment." Owenby v. Young, 357 N.C. 142, 145, 579 S.E.2d 264, 266 (2003) (citing Stanley v. Illinois, 405 U.S. 645, 661, 92 S.Ct. 1208, 1217-18, 31 L.Ed.2d 551, 559 (1972)). Our Supreme Court has held that "absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of parents to custody, care, and control of their children must prevail." Petersen v. Rogers, 337 N.C. 397, 403-04, 445 S.E.2d 901, 905 (1994).
The Respondent-father in this case argues that his parental rights were terminated without sufficient evidence of unfitness or neglect. However, as the majority states, our Supreme Court's holding in Owenby stands for the principle "that a finding under *166 any of the provisions in section 7B-1111 will result in a parent `forfeit[ing] his or her constitutionally protected status.'" (quoting Owenby, 357 N.C. at 145, 579 S.E.2d at 267).
In this case, there is no issue as to whether the Respondent-father is in fact the biological father of the child. Indeed, the trial court found that "[p]aternity testing confirmed that [Respondent-father] is the father of the child that is the subject of this action." However, we have previously explained that "a father's constitutional right to due process of law does not `spring full-blown from the biological connection between parent and child' but instead arises only where the father demonstrates a commitment to the responsibilities of parenthood." In re Dixon, 112 N.C.App. 248, 251, 435 S.E.2d 352, 354 (1993)(quoting Lehr v. Robertson, 463 U.S. 248, 260, 103 S.Ct. 2985, 2992, 77 L.Ed.2d 614, 626 (1983)).
"Section 7B-1111 of our statutes, which establishes grounds for terminating parental rights, is used to determine a putative father's commitment to his child." In re Williams, 149 N.C.App. 951, 958, 563 S.E.2d 202, 206 (2002). It follows that if the father does not meet the requirements of the statute, he is not entitled to the Petersen presumption. See Dixon, 112 N.C.App. at 251, 435 S.E.2d at 353-54. The trial court concluded that the Respondent-father had not satisfied the requirements of N.C. Gen.Stat. § 7B-1111(a)(5) in that he only offeredand did not actually providefinancial support.
With due regard for the harshness of this result, I agree that it follows our case law. See A Child's Hope, LLC v. Doe, 178 N.C.App. 96, 103, 630 S.E.2d 673, 677 (2006) (noting "similarity of the requirements between the statute permitting the termination of a putative father's rights and the statute requiring the consent of a father of a child born out of wedlock to its adoption"); see also In re Adoption of Anderson, 360 N.C. 271, 279, 624 S.E.2d 626, 630 (2006) ("So long as the father makes reasonable and consistent payments for the support of mother or child [as to a savings account or trust fund], the mother's refusal to accept assistance cannot defeat his paternal interest."). I therefore concur in the result.
NOTES
[1] Generic names are used throughout to protect the identity of the juvenile.
[2] See N.C. Gen.Stat. § 50-13.4(b) (2009) ("[P]arents of a minor, unemancipated child who is the custodial or noncustodial parent of a child shall share this primary liability for their grandchild's support with the minor parent, the court determining the proper share, until the minor parent reaches the age of 18 or becomes emancipated.").
[3] We recognize that the trial court could have concluded that, even though a ground existed to terminate Joe's parental rights, the bond between a biological father and son was in the best interests of Austin in this case rather than leaving Austin with the adoptive parents. The trial court did not so conclude, and so our constitutional concerns with respect to section 7B-1111(a)(5) rest purely on whether Joe's protected status was properly removed, and not whether the trial court properly weighed that Austin's best interests were served by placement with the adoptive family.