IN THE SUPREME COURT OF NORTH CAROLINA

No. 268A19

Filed 18 December 2020

IN THE MATTER OF: R.D.


Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 6 March 2019 by Judge Elizabeth Trosch in District Court, Mecklenburg County. Heard in the Supreme Court on 2 September 2020.

*Thurman, Wilson, Boutwell & Galvin, P.A., by W. David Thurman and Thomas J. Thurman, for petitioner-appellant Bethany Christian Services.*

*Wendy C. Sotolongo, Parent Defender, by J. Lee Gilliam, Assistant Parent Defender, for respondent-appellee father.*

DAVIS, Justice.

In this case, we address several issues relating to the manner in which dispositional hearings in termination of parental rights cases are conducted and the factors that a trial court may properly consider in making a determination as to whether termination is in the best interests of the juvenile. For the reasons set out below, we affirm in part and vacate and remand in part for the entry of a new dispositional order.

**Factual and Procedural Background**

This case involves a private termination of parental rights proceeding initiated by petitioner Bethany Christian Services (BCS), a private adoption agency, against

the father (respondent) of the juvenile. The minor child "Ryan"[1] was born in October 2017 to respondent and "Brittany." Respondent and Brittany met at school in 2016 when they were 15 and 14 years of age, respectively. The two were family friends and lived in the same neighborhood. In January 2017, respondent and Brittany began a sexual relationship that lasted until March 2017.

Brittany discovered that she was pregnant in March 2017. Later that month, respondent blocked Brittany from contacting him on social media—the primary means that the two had used to communicate with each other. The two offered differing accounts in their testimony as to why this occurred. Brittany testified that respondent blocked her immediately after she informed him of the pregnancy, but respondent testified that he did so because "[s]he was becoming annoying."

Brittany changed schools while she was pregnant, and respondent's family moved away from Brittany's neighborhood. Respondent did not see Brittany over the summer of 2017, and, according to respondent, no discussion took place between them during that time as to whether she might be pregnant.

Brittany gave birth to Ryan in October 2017 in Mecklenburg County. The day after Ryan's birth, Brittany signed a document relinquishing her parental rights over Ryan to BCS and also signed an affidavit naming respondent as the father of Ryan. Brittany selected Jason and Demi Dowdy as the prospective adoptive parents for Ryan, and Ryan was placed with the Dowdys on 1 November 2017. Ryan has lived

---

[1] Pseudonyms are used throughout this opinion in order to protect the identity of the minor child.

exclusively with the Dowdys since that time. Following Ryan's placement with the Dowdys, BCS attempted to contact respondent by sending letters to the address listed in Brittany's affidavit. However, Brittany had mistakenly written down the wrong house number when listing respondent's address, and respondent never received the letters.

Respondent testified that he was not aware of Brittany's pregnancy or the birth of Ryan until 2018. He stated that in January of 2018 he heard rumors at school that Brittany had given birth, and respondent's sister testified that she had seen a photo of Brittany with Ryan on social media. Nevertheless, respondent did not take any steps to investigate whether he might be the father of Brittany's child and did not make any attempt to contact Brittany until after he was served with BCS's termination petition several months later.

BCS filed its petition to terminate respondent's parental rights on 21 November 2017, alleging that respondent had neglected Ryan under N.C.G.S. § 7B-1111(a)(1) and had failed to establish paternity under N.C.G.S. § 7B-1111(a)(5). After several unsuccessful efforts to locate respondent both by mail and via the internet, BCS finally served respondent at his new address on 6 March 2018. After receiving the petition, respondent's mother paid for a paternity test. Upon confirming that respondent was, in fact, the father of Ryan, respondent's mother began the process of challenging BCS's custody of Ryan.

At a pretrial hearing on 30 May 2018, the trial court appointed Rhonda Hitchens—a local attorney—to serve as the guardian *ad litem* (GAL) for Ryan in the

termination proceeding. The adjudication stage of the termination proceeding was held on 24 August 2018. During the adjudication stage, the trial court dismissed the ground of neglect but found the existence of a ground for termination under N.C.G.S. § 7B-1111(a)(5) due to respondent's failure to establish paternity.

The dispositional stage of the termination proceeding was subsequently held over the course of two dates—31 October 2018 and 9 January 2019. During the dispositional hearing, the trial court directed Hitchens to take the witness stand in order to testify about the GAL's report she had prepared. The GAL's report contained summaries of interviews with twenty individuals connected with the case, an assessment of Ryan's needs and interests, and Hitchens' ultimate recommendation that respondent's parental rights not be terminated.

Respondent objected to Hitchens being called as a witness on the ground that allowing her to testify about her report would create a conflict of interest by requiring her to act as both a lawyer and witness in violation of Rule 3.7 of the North Carolina Rules of Professional Conduct.[2] In response, BCS argued that it would not be improper for Hitchens to testify and that BCS should have the right to cross-examine Hitchens about the contents of her report.

---

[2] Rule 3.7(a) provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." N.C. Rev. R. Prof. Conduct 3.7(a).

The trial court ultimately presented Hitchens with two options—either to (1) testify as a witness and withdraw as Ryan's attorney advocate; or (2) remain as his attorney advocate and submit her written report to the trial court without testifying. Hitchens chose the second option, and her report was admitted into evidence without her testimony. BCS objected to the admission of Hitchens' report on the grounds that the report presented an improper expert opinion on the ultimate issue of whether termination would be in Ryan's best interests and that it had been denied its right to cross-examine her. The trial court overruled this objection and also denied BCS's request to present an offer of proof regarding the testimony Hitchens would have given had she testified.

At the conclusion of the hearing, the trial court determined that termination of respondent's parental rights was not in Ryan's best interests. The trial court entered a written order dismissing BCS's petition to terminate parental rights on 6 March 2019. BCS appealed to this Court pursuant to N.C.G.S. § 7B-1001(a1)(1).

**Analysis**

Our Juvenile Code provides for a two-step process for the termination of parental rights—an adjudication stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). At the adjudication stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence that one or more grounds for termination exist under N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(e), (f). If the trial court finds the existence of one or more grounds to terminate the respondent's parental rights, the matter proceeds to the dispositional stage where the trial court

must determine whether terminating the parent's rights is in the juvenile's best interests. N.C.G.S. § 7B-1110(a).

"We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). With regard to the trial court's assessment of a juvenile's best interests at the dispositional stage, however, we review that decision "solely for abuse of discretion." *In re A.U.D.*, 373 N.C. 3, 6 (2019). "[A]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 6–7 (alteration in original) (quoting *In re T.L.H.*, 368 N.C. 101, 107 (2015)).

BCS raises a number of arguments on appeal, which essentially raise two primary issues. First, BCS contends that the trial court's admission of the GAL's report during the dispositional stage of the termination proceeding without allowing Hitchens to be cross-examined about the report constituted an abuse of discretion. Second, BCS asserts that the trial court's written order contained key findings of fact that lacked evidentiary support in the record. We address each argument in turn.

## I. Admission of the GAL's Report Without the Opportunity for Cross-Examination

BCS initially argues that the trial court should not have admitted the GAL's report into evidence during the dispositional stage without affording its counsel the opportunity to cross-examine Hitchens about the contents of the report. In order to

fully analyze this issue, it is necessary to review the legal framework governing the

role of the GAL in termination of parental rights proceedings. Our Juvenile Code

provides for the appointment of a GAL in a termination proceeding as follows:

> (b) If an answer or response denies any material
> allegation of the petition or motion, the court shall appoint
> a guardian ad litem for the juvenile to represent the best
> interests of the juvenile, unless the petition or motion was
> filed by the guardian ad litem pursuant to G.S. 7B-1103, or
> a guardian ad litem has already been appointed pursuant
> to G.S. 7B-601. A licensed attorney shall be appointed to
> assist those guardians ad litem who are not attorneys
> licensed to practice in North Carolina. . . .
>
> (c)   In proceedings under this Article, the appointment of a
> guardian ad litem shall not be required except, as provided
> above, in cases in which an answer or response is filed
> denying material allegations, or as required under G.S. 7B-
> 1101; but the court may, in its discretion, appoint a
> guardian ad litem for a juvenile, either before or after
> determining the existence of grounds for termination of
> parental rights, in order to assist the court in determining
> the best interests of the juvenile.

N.C.G.S. § 7B-1108(b)–(c) (2019).

Our Juvenile Code also states the following with respect to the GAL's duties:

> [t]he duties of the guardian ad litem program shall be to
> make an investigation to determine the facts, the needs of
> the juvenile, and the available resources within the family
> and community to meet those needs; to facilitate, when
> appropriate, the settlement of disputed issues; to offer
> evidence and examine witnesses at adjudication; to explore
> options with the court at the dispositional hearing; to
> conduct follow-up investigations to insure that the orders
> of the court are being properly executed; to report to the
> court when the needs of the juvenile are not being met; and
> to protect and promote the best interests of the juvenile
> until formally relieved of the responsibility by the court.

N.C.G.S. § 7B-601(a) (2019).

This Court has recognized that in termination cases where a respondent-parent files an answer denying material allegations in a termination petition, "the trial court (1) must appoint a GAL for the juvenile, and (2) must appoint a licensed attorney . . . if the appointed GAL is not an attorney." *In re C.J.C.*, 374 N.C. 42, 44 (2020). It is therefore clear that in some cases a GAL may be appointed to serve in a dual role as both the juvenile's GAL *and* attorney advocate. *See In re J.H.K.*, 365 N.C. 171, 175–76 (2011) ("Thus, if the GAL is an attorney, that person can perform the duties of both the GAL and the attorney advocate. . . . [The Juvenile Code] recognizes that in TPR proceedings the [GAL] attorney advocate is to perform the traditional role of a lawyer . . . ."). Moreover, subsection (c) of N.C.G.S. § 7B-1108 provides that even when the trial court is not expressly required to appoint a GAL, the trial court may still do so in its discretion "in order to assist the court in determining the best interests of the juvenile." N.C.G.S. § 7B-1108(c). This language makes clear that one of the statutorily enumerated functions of a GAL is to assist the trial court in making its best interests determination during the dispositional stage.

In light of the specific argument BCS asserts in this appeal, we must also address the evidentiary distinctions between the adjudication and dispositional stages of termination proceedings. The portion of the Juvenile Code governing the adjudication stage of termination proceedings provides, in pertinent part, that

> [t]he burden in such proceedings shall be upon the petitioner or movant and all findings of fact shall be based on clear, cogent, and convincing evidence. *The rules of*

> *evidence in civil cases shall apply*. No husband-wife or physician-patient privilege shall be grounds for excluding any evidence regarding the existence or nonexistence of any circumstance authorizing the termination of parental rights.

N.C.G.S. § 7B-1109(f) (emphasis added).

With regard to the dispositional stage, however, the General Assembly has stated the following:

> After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest. *The court may consider any evidence, including hearsay evidence as defined in G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile.*

N.C.G.S. § 7B-1110(a) (emphasis added).

These statutes make clear that during the adjudication stage of a termination proceeding, the trial court must apply the provisions of the North Carolina Rules of Evidence that apply in all civil cases. During the dispositional stage, conversely, the trial court retains significantly more discretion in its receipt of evidence and may admit *any* evidence that it considers to be relevant, reliable, and necessary in its inquiry into the child's best interests—even if such evidence would be inadmissible under the Rules of Evidence.

\* \* \*

Applying these principles to the present case, we must first decide whether the GAL's report was admissible—that is, whether the trial court erred in its implicit determination that the report was "relevant, reliable, and necessary to determine the

best interests of the juvenile." N.C.G.S. § 7B-1110(a). We agree with respondent that the trial court did not abuse its discretion in determining that the report provided by Hitchens met each of these criteria. The report contained summaries of interviews with twenty different persons having some connection with the case, an analysis of the needs of Ryan, and Hitchens' ultimate recommendation that the trial court not terminate respondent's parental rights. The report detailed the basis of Hitchens' opinion and thoroughly set out both the pros and cons of terminating respondent's parental rights. This report was therefore directly related to the trial court's task during the dispositional stage. Thus, the trial court possessed the discretion to determine that the report was, in fact, "relevant, reliable, and necessary" to determine the best interests of Ryan.

We also observe that the admission of a GAL's report at the best interests stage of a termination proceeding is a commonplace occurrence and that such reports are frequently introduced in order to aid the trial court in determining the juvenile's best interests. *See, e.g., In re N.G.*, 374 N.C. 891, 905 (2020) (noting that the trial court admitted a "detailed [GAL] report" during the dispositional stage and that "[n]o objection was made and said report was received into evidence and considered by the [trial court] on the issue of best interest"); *In re A.L.L.*, 254 N.C. App. 252, 261 (2017) ("In the dispositional phase, the trial court received the report of the guardian ad litem . . . ."); *In re M.A.I.B.K.*, 184 N.C. App. 218, 221 (2007) (noting that during the best interests determination the trial court "considered a report on the child's best interests submitted by her guardian ad litem").

BCS argues, however, that the trial court was required to make explicit findings setting out *why* it found the GAL's report to be "relevant, reliable, and necessary" pursuant to N.C.G.S. § 7B-1110(a) before admitting it into evidence. This argument is unavailing. This Court has never interpreted N.C.G.S. § 7B-1110(a) to impose such a requirement, and nothing in the statutory text indicates that the General Assembly intended that such express findings be required. By way of contrast, we note that other portions of the Juvenile Code *do* require explicit factual findings in certain contexts. *See, e.g.*, N.C.G.S. § 7B-1101 (2019) ("[T]he court *shall find* that it has jurisdiction to make a child-custody determination . . . .") (emphasis added)). The absence of any analogous language in N.C.G.S. § 7B-1110(a) demonstrates that no explicit findings are necessary when a trial court deems it appropriate to consider evidence that would otherwise be inadmissible under the Rules of Evidence.

Having determined that the trial court did not abuse its discretion in admitting the GAL's report, we must next determine whether the trial court committed reversible error in declining to require that Hitchens be subject to cross-examination after her report was admitted into evidence. During the dispositional stage of the termination proceeding, the trial court initially asked Hitchens to take the witness stand to testify regarding her report. Respondent, however, objected to Hitchens being called as a witness, contending that her dual role as an attorney advocate and as a factual witness would create an impermissible ethical conflict under Rule 3.7 of the North Carolina Rules of Professional Conduct. After hearing arguments on this

issue from both parties and consulting the North Carolina Rules of Professional Conduct, the trial court ultimately ruled that Hitchens "being compelled to testify or giving testimony as a witness would constitute a violation of Rule 3.7 and necessitate her withdrawal." The trial court then gave Hitchens the option either to testify and withdraw as Ryan's advocate or—alternatively—to introduce her written report without giving any testimony at all. Hitchens chose the latter option.

BCS argues that it was improperly deprived of its right to cross-examine Hitchens by the trial court's ruling. BCS asserts that a party has the absolute right to "an opportunity to fairly and fully cross-examine a witness who has testified for the adverse party." *Citizens Bank & Tr. Co. v. Reid Motor Co.*, 216 N.C. 432, 434 (1939). Because the GAL's report in this case contained relevant evidence— including interviews with persons who did not appear in court and a recommendation from Hitchens regarding Ryan's best interests—BCS contends that it should have been allowed to question her regarding the basis for her opinion and the methods she used to conduct these interviews. Similarly, BCS challenges the trial court's characterization of the ethical conflict that would exist under Rule 3.7 if Hitchens had been required to testify, contending that there is no legal authority in this state preventing a party from compelling a material witness to testify. Finally, BCS argues that the trial court committed prejudicial error by denying its offer of proof regarding Hitchens' anticipated testimony.

In response, respondent contends that BCS was not entitled to cross-examine Hitchens as a matter of right because the dispositional stage of a termination

proceeding is inherently non-adversarial in nature. Respondent further asserts that the relaxed evidentiary standards applicable to dispositional hearings under N.C.G.S. § 7B-1110(a) do not lend themselves to bright-line rules regarding the manner in which evidence may be admitted by a trial court during this stage of a termination proceeding.

As a preliminary matter, we first address BCS's contention that the trial court's ruling amounted to a deprivation of its constitutional due process right to cross-examine an opposing witness. Because BCS made no constitutional argument before the trial court, this issue is not properly before us. *See State v. Golphin*, 352 N.C. 364, 411 (2000) ("Constitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal."). As a result, the only issue for our determination is whether the trial court acted within its discretion by refusing to allow cross-examination of Hitchens. On these facts, we cannot say that an abuse of discretion occurred.

While it is axiomatic that cross-examination of an adverse witness is an essential right in adversarial proceedings, *see, e.g., Brewer v. Garner*, 264 N.C. 384, 386 (1965), the dispositional stage of a termination proceeding is not adversarial. *See Stephens v. Stephens*, 213 N.C. App. 495, 503 (2011) (quoting *Ramirez-Barker v. Barker*, 107 N.C. App. 71, 78 (1992)) (" '[T]he best interest' question is thus more inquisitorial in nature than adversarial . . . ."). Instead, the focus during the dispositional stage is entirely on ascertaining the best interests of the child by utilizing whatever evidence the trial court believes is most "relevant, reliable, and

necessary." N.C.G.S. § 7B-1110(a). This statute gives the trial court broad discretion regarding the receipt of evidence in its quest to determine the best interests of the child under the particular circumstances of the case. Although this reservoir of discretion is not limitless, we are satisfied that here the trial court's ruling on this issue was within its discretion.[3]

Our conclusion is supported by the language of N.C.G.S. § 7B-1110(a) itself, which—as noted above—expressly allows the trial court to consider hearsay evidence. *See* N.C.G.S. § 7B-1110(a) ("The court may consider any evidence, including hearsay evidence . . . ."). Hearsay, by definition, is an out-of-court statement that is not subject to cross-examination. *See State v. Baymon*, 336 N.C. 748, 759 (1994) (quoting N.C.G.S. § 8C-1, Rule 801(c)). Accordingly, because the statute expressly allows the admission of evidence which inherently cannot be subject to cross-examination, our legislature has made clear that no absolute right to cross-examination exists during the dispositional stage.[4]

We deem instructive this Court's decision in *In re J.H.K.* In that case, the trial court appointed the juveniles a GAL and a separate attorney advocate shortly after DSS obtained custody of them. *J.H.K.*, 365 N.C. at 172. At the subsequent

---

[3] For example, we are not confronted with a scenario in which the trial court allowed the GAL to testify on direct examination for respondent but then refused to allow cross-examination by BCS. Instead, the trial court allowed the GAL's report to speak for itself.

[4] Although BCS contends that cross-examination was particularly warranted because the GAL's report contained Hitchens' expert opinion regarding Ryan's best interests, Hitchens made clear to the trial court that she was not holding herself out as an expert witness or purporting to offer an expert opinion.

termination proceeding, the attorney advocate was present, but the juveniles' GAL was absent from the courtroom. *Id*. at 173. On appeal, the respondent-parent argued that the trial court erred by conducting the termination proceeding without the children's GAL being physically present. *Id*. We disagreed, holding that a "nonlawyer GAL volunteer is not required to be physically present at the TPR hearing." *Id*. at 178. In explaining our ruling, we emphasized the "separate in-court and out-of-court responsibilities" of the nonlawyer GAL—such as investigation and observation of the needs of the children. *Id*. at 176. We noted that "[a]lthough the GAL's presence at the TPR hearing may be preferable," nothing in the Juvenile Code explicitly requires the GAL's attendance. *Id*.

We further held that it was clear that the GAL had fulfilled her statutory duties by "regularly fil[ing] reports describing the children's needs . . . . and her recommendations concerning the best interests of the children in light of her ongoing investigation of their case." *Id*. at 177. Meanwhile, the attorney advocate had, in turn, complied with her respective duties by "appear[ing] at every hearing documented in the record" and by examining witnesses and introducing the GAL's report at the termination proceeding. *Id*. Thus, we concluded that "[t]hrough the work of its team members appointed to th[e] case, the GAL program satisfied its out-of-court investigatory duties as well as its in-court representational duties." *Id*. at 178.

Although *In re J.H.K.* did not involve the specific issue raised by BCS in the present case, it is nevertheless consistent with our ruling today. If the GAL is not even required to be present in the courtroom at the termination proceeding, then

logically there is no absolute right to cross-examine the GAL in cases where she is present but does not testify for the adverse party. *In re J.H.K.* further demonstrates that a GAL can fulfill her "out-of-court investigatory duties" simply by submitting her written report to the trial court—which is what ultimately happened here. *Id.*

Moreover, the existence of the potential for an ethical conflict pursuant to Rule 3.7 of the Rules of Professional Conduct makes the trial court's refusal to require Hitchens to testify even more reasonable. After becoming aware of the possible ethical conflict, the trial court (1) heard arguments on this issue from both parties; (2) reviewed Rule 3.7, the relevant portions of the Juvenile Code, and case law regarding the duties of the GAL; and (3) made a phone call to the North Carolina State Bar seeking guidance on this ethical issue. The trial court then offered Hitchens the option to either testify as a witness and withdraw as Ryan's advocate or submit her written report without testifying and continue to serve as Ryan's advocate. In so doing, we are satisfied that the trial court acted within its authority in attempting to resolve this issue. Accordingly, BCS's argument is overruled.

## II.    Best Interests Determination

BCS next makes several arguments regarding the trial court's dispositional findings of fact in its written order. Specifically, BCS contends that the trial court (1) improperly placed a burden of proof upon BCS during the dispositional stage; (2) failed to properly consider the statutory factors relevant to the best interests determination; and (3) made several material findings of fact that were unsupported

by the evidence including, most notably, a finding about alleged harms associated with adoption generally.

We first address BCS's argument regarding the burden of proof during disposition. BCS argues that the trial court's order incorrectly (1) conflated the applicable burden of proof with the statement of legislative purpose set out in the Juvenile Code; and (2) suggested that BCS bore the burden of proving that respondent was not a capable parent.

In its written order, the trial court looked to the stated legislative purpose contained in the section of the Juvenile Code governing termination proceedings for guidance in making its dispositional findings. The trial court's order noted that

> [t]he court, in making its [best interests] determination, has considered the general purpose of Article 11, which is to provide judicial procedures for terminating the legal relationship between a child and the child's biological or legal parents when the parents have demonstrated that they will not provide the degree of care which promotes the healthy and orderly physical and emotional well-being of the child.

The trial court also framed several of its dispositional findings in terms of whether or not respondent had "demonstrated an inability or unwillingness to provide the degree of care which promotes the healthy and orderly physical and emotional well-being of the child."

As noted by BCS, this language in the trial court's order is drawn directly from N.C.G.S. § 7B-1100, which sets out the underlying legislative intent with regard to the statutory scheme governing termination of parental rights proceedings. *See*

N.C.G.S. § 7B-1100(1) (2019) ("The general purpose of this Article is to provide judicial procedures for terminating the legal relationship between a juvenile and the juvenile's biological or legal parents when the parents have demonstrated that they will not provide the degree of care which promotes the healthy and orderly physical and emotional well-being of the juvenile.").

However, we do not believe that it is improper for a trial court to look to the General Assembly's intent as set out in the Juvenile Code for guidance when making its dispositional findings of fact. In fact, this Court has similarly examined statements of legislative intent contained within the Juvenile Code in reviewing orders involving the termination of a party's parental rights. *See, e.g., In re F.S.T.Y.,* 374 N.C. 532, 540 (2020). Moreover, although it is true that the trial court's order does not recite *all* of the legislative policies contained in N.C.G.S. § 7B-1100, we are unaware of any rule that required it to do so.

BCS further contends that the trial court improperly suggested that BCS bore the burden of proof during the dispositional stage. BCS is correct that—unlike during the adjudication stage—no burden of proof should be imposed upon either party at the dispositional stage. *Compare* N.C.G.S. § 7B-1109(f) ("The burden in [adjudication] proceedings shall be upon the petitioner or movant . . . ."), *with* N.C.G.S. § 7B-1110 (containing no burden of proof requirement). *See also In re Anderson*, 151 N.C. App. 94, 96 (2002) ("There is no burden of proof on the parties at disposition."). However, our reading of the trial court's order does not reveal any indication that the trial court actually imposed a burden of proof upon BCS.

BCS also argues that the trial court erred by either minimizing or ignoring altogether the five statutory factors required to be considered in the best interests analysis under N.C.G.S. § 7B-1110(a). Most notably, BCS contends that the trial court failed to sufficiently consider Ryan's high likelihood of adoption, his lack of a bond with respondent, and whether termination would aid in accomplishing Ryan's permanent plan of adoption. BCS also claims that the trial court placed too much weight on the statutory "catchall" provision under N.C.G.S. § 7B-1110(a)(6). Section 7B-1110 states, in pertinent part, as follows:

> In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
> (1) The age of the juvenile.
> (2) The likelihood of adoption of the juvenile.
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
> (4) The bond between the juvenile and the parent.
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a).

We have held that the five enumerated factors are not exclusive, as subsection (a)(6) expressly authorizes a trial court to rely on any other "relevant consideration" it deems pertinent to the best interests determination. *See In re A.R.A.*, 373 N.C. 190, 200 (2019) ("In addition to the statutory factors set out in N.C.G.S. § 7B-1110(a)(1)– (5), the district court considered other relevant factors, as it was permitted to do under N.C.G.S. § 7B-1110(a)(6) . . . .").

We previously rejected an argument similar to that made by BCS in *In re A.U.D.* There, the respondent-parent contended that "the trial court did not make sufficient findings regarding the factors set forth in N.C.G.S. § 7B-1110(a)" and that the trial court improperly weighed these factors by relying too heavily on the "catchall" provision under (a)(6). *A.U.D.*, 373 N.C. at 10. We disagreed, explaining that while "[i]t is clear that a trial court must *consider* all of the factors in section 7B-1110(a)," a court need not make explicit "written findings as to each factor." *Id.* Because the transcript indicated that the trial court considered each of the five statutory factors, we held that there was no violation of N.C.G.S. § 7B-1110(a). *Id.* We further determined that it was permissible for the trial court to "consider[ ] other relevant circumstances . . . under N.C.G.S. § 7B-1110(a)(6)" in making its best interests determination—such as the circumstances surrounding the children's adoption and the respondent's recent "strides in self-improvement." *Id.* at 12. As for the respondent's argument regarding the allegedly erroneous weighing of the statutory factors, we noted that while some "evidence existed that would have supported a contrary decision . . . . this Court lacks the authority to reweigh the evidence that was before the trial court." *Id.*

Here, as in *In re A.U.D.*, we are satisfied that the trial court properly considered each of the statutory factors. Indeed, the trial court's order stated that "[t]he court has considered each of the six criteria set out in subsection 1110, and makes written findings on those factors that are relevant, placing significant weight on the sixth criteria which addresses any relevant consideration." Furthermore, to

the extent that BCS is contending that the trial court improperly weighed and balanced the six factors in reaching its conclusion, such balancing is uniquely reserved to the trial court and will not be disturbed by this Court on appeal. *See In re A.U.D.*, 373 N.C. at 12 ("[T]his Court lacks the authority to reweigh the evidence that was before the trial court.").

Finally, we address BCS's various challenges to the trial court's factual findings in its written order. During the dispositional stage, we review the trial court's factual findings to determine if they are supported by competent evidence. *In re K.N.K.*, 374 N.C. 50, 57 (2020) ("The trial court's dispositional findings of fact are reviewed under a 'competent evidence' standard."). In making findings of fact, "it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn from the testimony." *In re T.N.H.*, 372 N.C. 403, 411 (2019). Moreover, findings of fact are binding "where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." *In re Montgomery*, 311 N.C. at 110–11.

BCS first challenges Finding of Fact 14, which discusses Brittany's attendance at a birthday party held by respondent's sister. Finding of Fact 14 states as follows:

> 14. [Brittany] attended a birthday party in May, 2017 for Respondent-Father's sister. This was a pool party to which [Brittany] wore a bikini. [Brittany] initially denied attending the party, but acknowledged her participation when confronted with photographic evidence of her presence. [Brittany] was not obviously pregnant and she did not disclose her pregnancy to any member of the father's family. Respondent-Father did not attend the birthday party.

BCS asserts that this finding is incorrect because the transcript demonstrates that Brittany never denied attending the party—rather, she simply stated that she did not recall whether she had attended the party.

The transcript reveals that, when Brittany was asked whether she had "any contact or communication" with anyone in respondent's family after becoming pregnant in March 2017, Brittany responded "[n]o." When initially asked about her attendance at the May 2017 pool party, Brittany stated that she "[didn't] recall" whether or not she had attended. After being asked about the pool party again on cross-examination and after being confronted with a photograph of her at the party, Brittany admitted that she was "the person wearing a pink bikini" in the photograph. To the extent that a portion of Finding of Fact 14 contained an inaccurate recitation of the evidence, we do not deem any such inaccuracy prejudicial. Indeed, the transcript reveals that Brittany initially denied having *any* contact with respondent's family after becoming pregnant but later admitted attending the party for respondent's sister while pregnant.

Second, BCS challenges Findings of Fact 42, 52, and 53, which discuss the "barriers" that prevented respondent from visiting Ryan and forming a bond with him after becoming aware of his birth. These findings state, in relevant part, as follows:

> 42. . . . . Additionally, in this case, the Respondent-Father was innocent in his ignorance of the pregnancy. . . .
>
> . . . .

52. That the only reason this child does not have a strong reciprocal bond with Respondent-Father is because of barriers that were erected after his birth which the Father could not, despite his efforts, overcome.

53. Immediately after he became aware of the existence of this child, Respondent-Father expressed his desire to visit with and establish a bond with his son. He was prohibited from doing so, both by [BCS] and the Court.

BCS asserts that no "barriers" were erected to deny respondent access to Ryan because it was respondent who (1) blocked Brittany on social media; (2) failed to ever inquire about whether Brittany was pregnant (despite knowing where she lived); and (3) heard rumors of her pregnancy in January 2018 but still did nothing to assert his parental rights until March 2018. For these same reasons, BCS argues that respondent was not "innocent in his ignorance of the pregnancy" and that he did not express a desire to visit Ryan "immediately" after becoming aware of Ryan's birth. BCS asserts that respondent knew about the pregnancy two months before service of the termination petition yet still took no action.

There was conflicting evidence in the record regarding respondent's knowledge of Brittany's pregnancy. Brittany testified that she informed respondent that she was pregnant in March 2017, but respondent denied this assertion and testified that he did not learn about the pregnancy until 2018—having first heard rumors about her pregnancy in January 2018 and receiving confirmation of her pregnancy when he was served with BCS's termination petition in March 2018. The trial court found respondent's account of these events to be credible and found Brittany's testimony "not believable"—as was its province as the trier of fact.

Moreover, the evidence of record permitted the trial court to conclude that barriers were erected after Ryan's birth that prevented respondent from bonding with Ryan. It is undisputed that Brittany relinquished her parental rights to Ryan one day after his birth and that Ryan was shortly thereafter placed with a prospective adoptive family without respondent's knowledge. Thus, the circumstances surrounding Ryan's adoption alone were enough to allow the trial court to infer that barriers existed that made it difficult—if not impossible—for him to bond with Ryan.

BCS next challenges the portions of Findings of Fact 15, 30, and 38 that discuss Brittany's "active efforts to conceal" her pregnancy from respondent. These findings provide as follows:

> 15. [Brittany's] guardians engaged in active efforts to conceal [her] pregnancy in that they withdrew her from the school she attended with Respondent-Father and sent her to a school outside of their community of residence.
>
> . . . .
>
> 30. . . . . The Respondent-Father's failure to provide an adequate standard of care for this minor child could not be willful because . . . [Brittany] and her guardians intentionally concealed her pregnancy from Respondent-Father [and] engaged in a process of planning for the child's future at the exclusion of the minor father . . . .
>
> . . . .
>
> 38. A fourteen year old child, with the counsel and assistance of her legal guardians, made a decision to conceal this pregnancy from a fifteen year old father, his family and the world . . . . All of these decisions were carried out by a minor child who intentionally excluded the father of her unborn child from the process.

BCS argues that none of the actions in which Brittany engaged were motivated by an intent to conceal her pregnancy from respondent. BCS asserts that (1) her family moved Brittany to a different school to prevent her from being bullied because of her pregnancy; (2) she informed respondent of her pregnancy; (3) she posted a picture of herself with Ryan on social media; and (4) she told BCS the correct name of the baby's father. BCS asserts that the lack of communication between the two was respondent's fault, as it was respondent who knew where Brittany lived at all times but chose not to contact her.

We reject BCS's argument as we believe that these findings were likewise supported by competent evidence. Given that the trial court disbelieved Brittany's claim that she informed respondent of the pregnancy, the remaining evidence could have led a reasonable trier of fact to conclude that Brittany and her family were intentionally concealing her pregnancy from respondent. First, Brittany changed schools while pregnant. She testified that she changed schools in order to avoid being bullied or harassed, but the trial court was free to reject her testimony and to infer that her true motivation for changing schools was to avoid contact with respondent. Second, Brittany listed the wrong address for respondent on her affidavit. While this could have been a simple mistake, it also would have been permissible for the trial court to infer that this inaccuracy was intentional given the trial court's unchallenged finding that Brittany gave "inconsistent, self-serving and untruthful testimony . . . concerning a number of substantive matters." Third, as noted above, there was evidence that Brittany and her family never attempted to contact respondent after

Ryan's birth, and it is uncontested that respondent was not consulted regarding the decision to relinquish Ryan for adoption.

Additionally, BCS challenges the portion of Finding of Fact 23 stating that BCS did not "engage in meaningful efforts to ascertain the proper address of the minor Respondent." BCS asserts that it asked Brittany for respondent's address and that BCS had no reason to believe that the address provided by Brittany would be inaccurate. BCS notes that it was unable to verify respondent's address through county property records because his family did not own the residence. BCS argues that it never gave up the search for respondent, claiming that it was not until after several months of undelivered letters as well as searches conducted through the internet, social media, criminal records, and Division of Motor Vehicles records that BCS could finally locate a current address for respondent's mother, who lived in a different county. Likewise, BCS also challenges the trial court's refusal to admit into evidence BCS's affidavit of service—a record that BCS contends documented its diligent efforts to search for respondent.

Although it is true that BCS took a number of steps to attempt to locate respondent—such as sending letters to the address for respondent listed in Brittany's affidavit and searching for respondent on social media and on the internet—the trial court noted that there were several other commonsense steps that BCS could have taken to find respondent but that it did not do so. For example, BCS did not seek additional information from Brittany or her family, who were known to be acquainted

with respondent's family. Nor did BCS attempt to obtain an address for respondent from the high school that he was known to attend.[5]

Finally, BCS challenges the portion of Finding of Fact 57 discussing the alleged "harm" associated with adoption generally. In the trial court's oral findings at disposition, the trial court not only emphasized the "need to protect all children from the unnecessary severance of relationship[s] with biological parents" but also went on to discuss the "harm or the challenges that children who are adopted often face." This concern was also reflected in Finding of Fact 57 of the written order, which states as follows:

> 57.  There is insufficient evidence that changing primary care givers and homes at fourteen months of age would be traumatic and should be considered a primary or compelling factor on best interests to terminate parental rights. A change in caregivers, routine and home must be balanced against *the harm that children who are adopted often face as they try to understand who they are, where they came from, and why they were not raised by their biological parents.*

(Emphasis added). BCS argues that this finding is unsupported by the evidence and that if the finding is allowed to stand, it will signal that adoptive families are deemed

---

[5] We also reject BCS's argument that the trial court committed reversible error by refusing to admit the affidavit of service, which described BCS's various efforts to contact respondent via mail, the internet, and through public records searches. The trial court received extensive testimony from BCS's representative Robyn Johnson regarding BCS's efforts to contact respondent. Given the broad amount of discretion that trial courts possess in making evidentiary rulings during the dispositional stage coupled with the fact that the majority of this information was described in Johnson's testimony, we do not believe that the trial court abused its discretion by declining to admit the affidavit of service.

by courts in this state to be inherently inferior to biological families for purposes of conducting a best interests determination.

We agree with BCS that the italicized portion of Finding of Fact 57 and the above-quoted oral findings by the trial court not only lack support in the record but can also be read as reflecting an inappropriate bias against adoption. At oral argument, counsel for respondent conceded that the trial court heard no evidence from the GAL or any other witness regarding any "harm" associated with adoption as a general proposition. Additionally, although it is true that our Juvenile Code states a preference for avoiding the dissolution of the biological parent-child relationship except when absolutely necessary, *see, e.g.,* N.C.G.S. § 7B-1100(2) (recognizing "the need to protect all juveniles from the unnecessary severance of a relationship with biological or legal parents"), this does not mean that adoption is contrary to the public policy of our state or that our law deems adoptive parental relationships to be any less valuable than biological parental relationships.

As articulated elsewhere in our General Statutes, the legislature has stated that "it is in the public interest to establish a clear judicial process for adoptions, [and] to promote the integrity and finality of adoptions." N.C.G.S. § 48-1-100(a) (2019). The General Assembly has further declared "as a matter of legislative policy" that it is desirable to "advance the welfare of minors by . . . facilitating the adoption of minors in need of adoptive placement by persons who can give them love, care, security, and support." N.C.G.S. § 48-1-100(b). This Court recognized eighty years ago that

> [t]he institution of adoption is a very worthy response of
> the law to social needs . . . . Instances of its beneficent effect
> may be found in the history of men and women who have
> been aided to become prominent in all lines of private and
> public service, and in the consolation it has given to
> hundreds of childless homes.

*Ward v. Howard,* 217 N.C. 201, 208 (1940).

In response, respondent argues that even if there was no evidence in the record about harm suffered generally by adopted children, it was nevertheless permissible for the trial court to make such an inference based on its own personal experience pursuant to the doctrine of judicial notice. We disagree.

We have held that "[a] matter is the proper subject of judicial notice only if it is 'known,' well established and authoritatively settled." *Hughes v. Vestal*, 264 N.C. 500, 506 (1965). Conversely, "[a]ny subject . . . that is open to reasonable debate is not appropriate for judicial notice." *Greer v. Greer*, 175 N.C. App. 464, 472 (2006). Here, it can hardly be said that it is "well established" or "authoritatively settled" that children who are adopted often face "harm" while growing up and attempting to understand their identity. *Hughes*, 264 N.C. at 506.

Accordingly, because no evidence existed in the record to support the trial court's finding on this issue and because the doctrine of judicial notice is inapplicable, we hold that the challenged portion of Finding of Fact 57 was erroneous. Furthermore, we deem this inappropriate finding to be prejudicial because of the possibility that it influenced the trial court's ultimate best interests determination. Although there were factors in this case suggesting that Ryan's interests were likely

to be best served by the termination of respondent's parental rights—such as Ryan's close bond with his prospective adoptive parents, the extremely high likelihood of adoption, his lack of any bond with respondent, and the very young age of respondent himself—the trial court ultimately found that these factors were outweighed not only by the importance of maintaining the biological parental bond between respondent and Ryan but also by the trial court's perception of the "harm" that adopted children face simply by virtue of the fact that they are adopted.

We are therefore unable to determine whether the trial court would have reached the same result in its best interests analysis but for the consideration of this improper finding. Thus, we remand this case to the trial court for the entry of a new dispositional order. We express no opinion as to the ultimate result of the best interests determination on remand, as that decision must be made by the trial court. The trial court shall have the discretion on remand to determine whether a new dispositional hearing is necessary.[6]

## Conclusion

For the reasons set out above, we affirm in part and vacate and remand in part for the entry of a new dispositional order.

---

[6] BCS also argues that the trial court erred in dismissing the ground of neglect during the adjudication stage. Because the trial court found that a separate ground for termination existed—i.e., respondent's failure to establish paternity—we need not address the trial court's determination regarding the ground of neglect. *See In re D.W.P.*, 373 N.C. 327, 340 (2020) ("Because there is sufficient evidence to support one ground for termination of respondent-mother's parental rights, the Court need not address the second ground for termination . . . ."); *In re E.H.P.*, 372 N.C. 388, 395 (2019) ("[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights.").

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

Justice EARLS concurring in part and dissenting in part.

I join the entirety of Part I of the majority opinion, which correctly resolves BCS's challenge to the trial court's admission of the GAL report. I also join Part II, except as to the majority's disposition of this appeal. In contrast to the majority, I believe there is sufficient evidence in the record to support the trial court's conclusion that terminating respondent-father's parental rights was not in the juvenile's best interests, even without the portion of the court's finding that it must consider "the harm that children who are adopted often face as they try to understand who they are, where they came from, and why they were not raised by their biological parents."[1] Accordingly, I dissent from the majority's decision to remand to the trial court for the entry of a new dispositional order and would instead affirm.

The trial court made specific findings of fact relating to all six enumerated factors provided by N.C.G.S. § 7B-1110(a) (2019). First, regarding "[t]he age of the juvenile," N.C.G.S. § 7B-1110(a)(1), the trial court found that because Ryan "is only

---

[1] The majority is correct that there was no expert witness testimony in this case documenting the impact of adoption on the adoptee, but I do not agree that its factual finding reflects "an inappropriate bias against adoption" on behalf of the trial court as asserted by the majority. There is a large body of academic research addressing this question. *See, e.g.,* David M. Brodzinsky et al., *Being Adopted: The Lifelong Search for Self* (1993) (describing seminal research on the unique stages of adoptee development); *Psychological Issues in Adoption* (David M. Brodzinsky & Jesús Palacios eds., 2005) (collecting works from psychologists engaged in adoption research, including issues of adoptive adjustments). While the existence of this body of research does not justify the trial court taking judicial notice of an adjudicative fact in this regard, it does demonstrate some basis for the trial court's concern.

fourteen months old . . . the establishment of a new primary care giver would not cause such a significant disruption in social and emotional well-being and development[ ] that it should preclude preservation of the relationship between this child and his father." Second, regarding "[t]he likelihood of adoption of the juvenile," N.C.G.S. § 7B-1110(a)(2), and "[w]hether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile," N.C.G.S. § 7B-1110(a)(3), the trial court found that because "the likelihood of adoption of this Juvenile is extremely high and the Dowdy's are absolutely committed to providing a permanent home through adoption, this is one of many counter-balancing considerations made by the Court." Third, regarding the "bond between the juvenile and the parent," N.C.G.S. § 7B-1110(a)(4), the trial court determined that this factor should be given "limited weight because the Mother's act of placing the child in the custody of Petitioner twenty-eight (28) days after birth combined with no clear statutory right to visitation pending this action, resulted in a limited opportunity for Respondent-Father [to] nurture and parent his son." The trial court further found that "the only reason this child does not have a strong reciprocal bond with Respondent-Father is because of barriers that were erected after his birth which the Father could not, despite his efforts, overcome." Fourth, regarding "[t]he quality of the relationship between the juvenile and the proposed adoptive parent[s]," N.C.G.S. § 7B-1110(a)(5), the trial court found that while "[t]his child has a very strong and reciprocal bond and attachment with the proposed adoptive parents and the extended

family members, and their entire circle of friends[,] . . . [t]he quality of the relationship with the prospective adoptive parents should not be the prevailing factor resulting in the deprivation of a relationship with Respondent-Father."

If the findings recounted above reflected the sum total of the trial court's dispositional findings, I might agree with the majority that a remand for further factfinding is appropriate. However, the trial court also expressly stated that, in reaching its ultimate conclusion at the dispositional stage, it was "placing significant weight on the sixth criteria which addresses any relevant consideration," referring to N.C.G.S. § 7B-1110(a)(6). Regarding this factor, the trial court made numerous findings of fact relating to "[t]he circumstances surrounding the [mother's] pregnancy and [Ryan's] birth," which tended to show that despite "fac[ing] extraordinary constraints to establishing his biological, legal[,] and personal relationship with his son," the respondent-father had "on service of the petition and learning of the existence of his son, contacted petitioner to request custody and visitation," and immediately "purchased and collected items to provide care for his son and unequivocally expressed his desire to exercise his parental rights and duties." The trial court found that the evidence presented "do[es] not also demonstrate that Respondent-Father will not provide the degree of care which promotes the healthy and orderly physical and emotional well-being of his child." Thus, in light of "the general purpose of Article 11, which is to provide judicial procedures for terminating the legal relationship between a child and the child's biological or legal parents when

the parents have demonstrated that they will not provide the degree of care which promotes the healthy and orderly physical and emotional well-being of the child," the trial court weighed the evidence against the statutorily enumerated factors and concluded that terminating respondent-father's parental rights did not serve Ryan's best interests.

The trial court's express statement that it was relying most heavily on findings related to N.C.G.S. § 7B-1110(a)(6) suggests that its consideration of the potential harms of adoption was not a basis for its ultimate conclusion. Further, absent this finding, the trial court's order bears substantial similarities to the order at issue in a recently decided case involving substantially similar facts, *In re A.U.D.*, 373 N.C. 3, 832 S.E.2d 698 (2019). In that case, we concluded that the trial court did not abuse its discretion in concluding that termination of parental rights was not in the best interests of the juveniles, reasoning that it was appropriate for the trial court to emphasize the importance of preserving ties between the children and their biological father and to consider the circumstances of the mother's relinquishment of the children which had deprived the respondent-father of an opportunity to develop a parental bond:

> Here, the trial court carefully weighed the competing goals of (1) preserving the ties between the children and their biological relatives; and (2) achieving permanence for the children as offered by their prospective adoptive family. In addition to the statutory factors set out in N.C.G.S. § 7B-1110(a)(1)–(5), the trial court also considered other relevant circumstances—as it was permitted to do under

> N.C.G.S. § 7B-1110(a)(6)—such as the fact that (1) [the juveniles] were relinquished to BCS solely at the behest of their mother; (2) respondent was never afforded the opportunity to parent [the juveniles] or provide for their care prior to their relinquishment; (3) upon learning of [the juveniles'] birth, respondent "proactively" attempted to establish paternity.

*Id.* at 12, 832 S.E.2d at 703–04. For similar reasons, I believe that the trial court's appropriate findings in this case are adequate to support its conclusion that termination of parental rights is unwarranted.

Our decision in *In re A.U.D.* reflected a recognition that "[o]ne of the stated policies of the Juvenile Code is to prevent 'the unnecessary or inappropriate separation of juveniles from their parents.' " *Id.* at 11, 832 S.E.2d at 703 (quoting N.C.G.S. § 7B-100(4) (2019)). Whatever the state of the evidence here regarding the potential impact on this child from being adopted, the trial court was entitled to conclude that because there was "substantial evidence that Respondent-Father is willing and capable of providing the degree of care that is necessary to promote the healthy and orderly physical and emotional well-being of his son," terminating respondent-father's parental rights was "unnecessary" to achieving an outcome that served the juvenile's best interests. An unwarranted skepticism of adoption is inconsistent with our Juvenile Code, but a belief that preserving the relationship between a child and a fit parent serves that child's best interests is perfectly appropriate. Although the trial court had no specific evidence of the impact of adoption generally, the trial court was well within its discretionary authority to

conclude that it served Ryan's best interests to preserve his relationship with a respondent-father who was ready and able to provide appropriate care.

Further, our decision in *In re A.U.D.* and other cases also reflect an appropriate respect for and deference to the judgment of trial courts tasked with weighing the often contradictory evidence presented during termination proceedings. As we indicated in that case, our sole task on appeal is to review the trial court's order and the underlying record to determine whether the trial court's conclusion that termination of respondent's parental rights was not in the children's best interests was either arbitrary or manifestly unsupported by reason. *See id.* at 12, 832 S.E.2d at 704; *see also In re I.N.C.*, 374 N.C. 542, 550, 843 S.E.2d 214, 220 (2020) ("[T]he responsibility for weighing the relevant statutory criteria delineated in N.C.G.S. § 7B-1110(a) lies with the trial court, which 'is permitted to give greater weight to other factors,' rather than with this Court.") (quoting *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 66 (2019)).

In the present case, it does not appear that the trial court's conclusion that termination of parental rights was not in Ryan's best interests rested upon its unsupported factual finding regarding the impact of adoption, nor was its ultimate conclusion "arbitrary" or "manifestly unsupported by reason" given the trial court's other findings at the dispositional stage of the proceeding. Upon close review of the trial court's order and the record, I cannot agree with the majority that the trial court's finding regarding the harms of adoption was so central to its determination

that respondent-father's parental rights should not be terminated as to permit us to disturb the trial court's reasoned judgment.

Therefore, I respectfully dissent from the majority's decision to remand to the trial court for the entry of a new dispositional order.

Chief Justice BEASLEY and Justice HUDSON join in this opinion concurring in part and dissenting in part.