An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-824

Filed 3 June 2026

Mecklenburg County, Nos. 23JA000320-590, 23JA000319-590

IN THE MATTER OF: J.D.W., A.R.W., Jr.

Appeal by respondent parents from order entered 4 June 2024 by Judge Faith Fickling-Alvarez in District Court, Mecklenburg County. Heard in the Court of Appeals 19 May 2026.

> *Mecklenburg County Attorney's Office, by Kristina A. Graham, for Mecklenburg County Department of Social Services.*
>
> *Administrative Office of the Courts, by GAL Staff Attorney Brittany T. McKinney, for guardian ad litem.*
>
> *Lisa Noda for respondent-appellant-mother.*
>
> *Jason Senges for respondent-appellant-father.*

STROUD, Judge.

Respondent parents appeal an order terminating their parental rights to their minor children, Jensen and Asher.[1] Mother argues that the trial court erred in denying her oral motion for the trial judge's recusal. Father's appellate counsel filed

---

[1] We use pseudonyms throughout this opinion to protect the minor children's identities.

a no-merit brief under Rule 3.1(e) of the North Carolina Rules of Appellate Procedure. We hold that Mother failed to present substantial evidence that the trial judge harbored personal bias or that circumstances would lead a reasonable person to question her impartiality. And we find no error in terminating Father's parental rights. We therefore affirm.

## I.      Background

In June 2023, the Mecklenburg County Department of Social Services, Division of Youth and Family Services (YFS) received a report about Respondents' household. At the time, one-year-old Jensen and two-year-old Asher lived with Mother and Father (collectively, Respondents), along with Father's two other children—twelve-year-old Aaron and fifteen-year-old Tina. The report came after emergency personnel responded to a call at Respondents' address. On arrival, they found Aaron "grievously injured." He died at the hospital shortly after.

On 15 June 2023, Father forced Aaron to hold a five-to-ten-pound weight over his head for at least three hours as punishment. Eventually, Aaron could not bear it—he "cried and begged for the punishment to stop." When he tried to escape into a nearby wooded area, Father caught him, punched him, and dragged him back to the house. Once inside, Father whipped Aaron with a belt, slapped him, dragged him, put him in a chokehold, pulled him by the hair, punched him, and beat him with a wooden club until he passed out. Aaron suffered a spleen laceration, multiple bruises and contusions, head injuries, and a fractured right humerus. His death was ruled a

"homicide by blunt force trauma."

Mother was present throughout. In fact, she "instructed [Aaron] to perform the punishment." When he tried to escape, she helped Father drag him back inside. Jensen and Asher—along with other half-siblings visiting that day—saw Aaron's "punishment, threats, beatings, and death." Mother "recognized the punishment as excessive." But she never intervened. She did not call the police. She did not remove Jensen and Asher from the home, even though, the court later found, she had "opportunities to protect [Aaron] and to remove the juveniles." Instead, she left home twice that day: once to deliver marijuana and once to go to the grocery store.

Respondents were arrested and charged with Aaron's murder on 16 June 2023. Mother was later convicted of accessory after the fact and felony child abuse. Father was convicted of second-degree murder, with "aggravating factors that it was especially cruel, the victim was especially young, and he reasonably knew or should have known that persons under the age of 18 could see and hear the offense."

YFS filed a petition on 22 June 2023 alleging that Jensen and Asher were neglected and dependent juveniles. Both children entered YFS's nonsecure custody that day. YFS voluntarily dismissed that petition and refiled on 18 July 2023.

The trial court conducted an adjudication hearing on 11 December 2023 and 5 January 2024. It heard testimony from several police officers, Respondents' former neighbor, and a social worker. The court also received over twenty exhibits into evidence, including crime scene photos, Aaron's hospital records, and Respondents'

criminal records.

On 22 January 2024, the court entered an order adjudicating Jensen and Asher neglected and dependent. Its findings of fact recounted Respondents' conduct on the day Aaron died, as described above. They also detailed the conditions inside Respondents' home: unsecured firearms (including one in a closet with five rounds chambered); soiled mattresses and broken furniture; a wooden club, refrigerator, walls, and pillow all bearing "suspected blood"; a chainsaw lying on the floor; at least eleven dogs and two cats; and dog feces and urine throughout the home. "These conditions," the court found, "were dangerous and injurious to the juveniles' welfare." Based on these and other findings, the trial court adjudicated the children neglected: they had not received proper care, supervision, or discipline, and they lived in an environment "injurious to their welfare," through their exposure to the home's conditions, to "cruel and heinous punishment," and to Aaron's death. The court also adjudicated the children dependent; Respondents, both incarcerated, could not provide for their care and lacked an alternative childcare arrangement.

The trial court held an initial disposition hearing two days later. A social worker and the children's guardian ad litem (GAL) testified. The court also received into evidence YFS's "Court Summary and Reasonable Efforts Report," the GAL's report, and various documents from Mother.

On 15 February 2024, the court entered a disposition order. Among other things, it found that Respondents' "actions in relation to [Aaron's] homicide in

[Jensen and Asher's] presence" were "egregious, and that their conduct increased the enormity of the injurious consequences" of the children's neglect. Based on those findings, the court determined that "reunification efforts with [Father] and [Mother] [we]re not required." *See* N.C. Gen. Stat. § 7B-901(c)(1)(f) (2025) (stating that reasonable reunification efforts "shall not be required" when "aggravated circumstances exist" based on a parent's "conduct that increased the enormity or added to the injurious consequences of the abuse or neglect"). It also found that "no compelling evidence warrant[ed] continued reunification efforts," and that ceasing such efforts was "in the children's best interests." The court ordered adoption as Jensen and Asher's primary permanent plan and guardianship as their secondary plan.

After a series of hearings, the trial court entered permanency planning orders on 1 April 2024 and 20 September 2024. In both, the court found that reunification remained contrary to the children's best interests and confirmed adoption as their primary permanent plan, with guardianship as their secondary plan.

On 7 May 2024, YFS petitioned to terminate Respondents' parental rights under North Carolina General Statute Sections 7B-1111(a)(1) and (a)(3).[2] *See* N.C. Gen. Stat. § 7B-1111(a) (2025) (Grounds for terminating parental rights). Mother

---

[2] YFS also petitioned to terminate Respondents' parental rights under Section 7B-1111(a)(8). But it withdrew that ground at the hearing.

and Father filed answers denying the petition's allegations.

The trial court held termination hearings on 5 February and 10 April 2025. At the outset, Mother's counsel informed the court that Mother wanted "a different [j]udge" to hear the case. Mother then testified, in pertinent part, that she felt the case "ha[d] been one-sided" since the beginning. After Mother's testimony, the trial court and her counsel discussed whether the request should be considered a motion to recuse.[3] The court ultimately denied the motion, finding "that it c[ould] be impartial in this case" and noting that Mother's request had been filed "within the existing . . . abuse, neglect, and dependency case" for which the trial judge remained the "assigned geo[-]district judge."[4]

---

[3] Mother filed no written recusal motion before trial, prompting some confusion at the hearing. The trial court explained that "a motion to recuse . . . has to be a certain way" and that Mother's request "wasn't a motion to recuse that was filed." The court reviewed her request as one "for a different judge to hear the case." Mecklenburg County's Local Rules require a written recusal motion in "domestic cases." *See* Meck. Cnty. L. R. 3.2 ("Motions requesting the recusal of the Assigned Judge must be filed and served on the opposing Party and the filing party must inform the [family court administrator] of the Motion being filed by emailing the [family court administrator] directly."). The rules define "domestic cases" as "[c]ases involving claims under Chapter 50 of the [North Carolina General Statutes] and all other cases involving family law disputes, such as a breach of a separation agreement, and motions to modify or enforce court orders." *Id.* at R. 1. But no such writing requirement appears in the local rules governing abuse, neglect, and dependency cases. And no party argues that the requirement applies here—or that Mother's oral motion was otherwise improper. Because a request "for a different judge to hear the case" is functionally a motion to recuse, we review the trial court's ruling as such.

[4] Mecklenburg County's Local Rules for juvenile abuse, neglect, and dependency cases define a "GEO District" as a "certain geographical location . . . within the county as determined by zip codes and designated within the Courts as Districts 1 through 4 to which each judge is assigned for purposes of hearing juvenile petitions." Meck. Cnty. Juv. L. R. 4. Under those rules, a judge is assigned to each case upon the filing of a petition. *Id.* at R. 11(a) ("Upon receipt of a new petition, the clerk's office shall enter the case into the . . . court reporting . . . system by Geo-District rather than by judges' names. Each Geo-District will be designated a number. Each judge will be assigned a particular Geo-

During the hearing's adjudication stage, the court heard testimony from permanency planning social worker Takia Adams and Mother. Adams testified again during the disposition stage, along with a GAL volunteer, the children's maternal great-aunt and grandmother, and Mother. Father presented no evidence.

On 4 June 2025, the trial court entered an order terminating Respondents' parental rights. The order first addressed Mother's "preliminary oral motion . . . requesting that a new judge be assigned due to her belief that the [c]ourt was one-sided." The court found that it "considered" the motion, that "no motion to recuse was filed in this matter," that it could "be impartial in this case," and that "the case ha[d] been assigned to her as the geo-district one judge." The order then incorporated the court's earlier adjudication findings, and the court made additional findings: that Respondents "lack insight into appropriate forms of punishment and discipline"; that "the likelihood of repetition of neglect if the children return home is high"; that "there was [a] lack of care and attention to these children in that they lived in a home that was completely uninhabitable"; that Respondents had a history with YFS; and that Father has another child "that was adjudicated neglected due to abuse at [his] hands."

Based on these and other findings, the court concluded that Mother and Father "ha[d] neglected the juveniles" under North Carolina General Statute Section 7B-

District."). The rules' purpose is "to reinforce the one judge one family model and simultaneously implement Geo-Districting." *Id.* at R. 11(j).

101(15) and "ha[d] acted inconsistently with their [c]onstitutionally protected parental status[es]." Those conclusions, the court ruled, established grounds to terminate their parental rights under Section 7B-1111(a)(1).[5] As for disposition, the court found that the "likelihood of the juveniles being adopted [wa]s high." And it determined that termination was in Jensen and Asher's best interests.

Respondents timely appealed.

## II.    Jurisdiction

This Court has jurisdiction under North Carolina General Statute Section 7B-1001(a)(7). *See* N.C. Gen. Stat. § 7B-1001(a)(7) (2025) ("[T]he following final orders may be appealed directly to the Court of Appeals: . . . [a]ny order that terminates parental rights or denies a petition or motion to terminate parental rights.").

## III.    Analysis

We start with Mother's appeal. She argues that the trial court erred in denying her oral motion for the trial judge's recusal. We disagree.

Canon 3 of the North Carolina Code of Judicial Conduct states that, "[o]n motion of any party," a judge should disqualify herself when her "impartiality may reasonably be questioned"—including when she "has a personal bias or prejudice

---

[5] The trial court declined to terminate Respondents' parental rights under Section 7B-1111(a)(3). Although Respondents had "a duty to pay" a "reasonable portion of the children's cost of care," the court found that they "did not have the ability to pay some amount greater than zero" "during the relevant six-month time period," and that their "failure to pay [was not] willful because [they] could not leave the jail."

concerning a party." N.C. Code of Jud. Conduct, Canon 3(C)(1)(a). The party seeking recusal bears the burden. She must "demonstrate objectively that grounds for disqualification actually exist." *Harrington v. Wall*, 212 N.C. App. 25, 28, 710 S.E.2d 364, 367 (2011) (citation omitted). And she has two ways to meet that burden: by "a showing of substantial evidence that there exists such a personal bias, prejudice[,] or interest on the part of the judge that he would be unable to rule impartially," or by a showing that "the circumstances are such that a reasonable person would question whether the judge could rule impartially." *Id.* "We thus review the trial court's order to determine whether [Mother] presented substantial evidence" on either front. *Id.*

At the termination hearing, Mother offered only her own testimony. As to her reasons for requesting a different judge, she stated, in full:

> I actually asked for a different [j]udge because since the beginning I feel like this case has been one-sided. You have yet to let me put on the record, according to – I wasn't even offered anything to even open a window as to continue to be a parent. I understand the criminal case that had to be closed at the time that it had to be closed but there's still no window. Like there's no options even though I was not found guilty of anything. So I feel like the window should still be open and I would like a new [j]udge, and possibly a new caseworker so we can get fresh eyes and fresh ears on this case.

None of this testimony supplies the "substantial evidence" required for recusal. Mother's subjective feeling that the case had been "one-sided" cannot, without more, demonstrate actual bias by the trial judge. *See id.* ("The burden is on the party moving for recusal to demonstrate *objectively* that grounds for disqualification

actually exist." (emphasis added) (citation and quotation marks omitted)).  And to the extent Mother meant that the trial court had not allowed her to put on her case, the record shows otherwise: Mother had counsel throughout and presented evidence at several hearings, including the initial disposition and termination hearings.  More generally, the court hewed to the Juvenile Code's statutory procedures for both abuse, neglect, and dependency proceedings and termination of parental rights proceedings—procedures the General Assembly enacted, in part, to "assure fairness and equity."  N.C. Gen. Stat. § 7B-100(1) (2025); *see also In re M.T.*, 285 N.C. App. 305, 319–21, 877 S.E.2d 732, 744–45 (2022) (outlining the statutory schemes for both types of hearings).

And the mere fact that the trial judge had previously made rulings adverse to Mother does not demonstrate improper "personal bias or prejudice" against her.  *See, e.g., In re M.A.I.B.K.*, 184 N.C. App. 218, 225, 645 S.E.2d 881, 886 (2007) ("Respondent-father cites no authority that would bar a trial judge from presiding in an action to terminate the parental rights of one parent of a child simply because the judge previously has terminated the rights of the other parent.").  Indeed, the "one judge, one family" policy—"[o]ften cited as the most critical component of any successful family court," and reflected in Mecklenburg County's local rules—helps "avoid the fragmentation, the duplication of effort and expense, and the potential for conflicting court orders" in domestic cases.  *Id.* (citation omitted).

On appeal, Mother makes new arguments. She points to the trial court's earlier decision to "cease[ ] reunification efforts" and to a comment the trial judge made during the termination hearing, contending that both show the judge "definitively . . . determin[ed]" to terminate her parental rights before trial. Alternatively, she argues that "the perception could certainly be created in the mind of a reasonable person that" the judge had so determined. But Mother made none of these arguments below and so waived all three. *See Dalenko v. Peden Gen. Contractors, Inc.*, 197 N.C. App. 115, 124, 676 S.E.2d 625, 632 (2009) (*per curiam*) ("To the extent that [the plaintiff] attempts to make different arguments for recusal in her brief that were not made at trial, those arguments are not properly before this Court.").

We hold that Mother failed to present "substantial evidence" of either personal bias by the trial judge or circumstances under which a "reasonable person would question whether the judge could rule impartially." *Wall*, 212 N.C. App. at 28, 710 S.E.2d at 367. The trial court did not err in denying her oral motion.

We now turn to Father's appeal. His counsel filed a no-merit brief under Rule 3.1(e) of the North Carolina Rules of Appellate Procedure. *See* N.C. R. App. P. 3.1(e) (allowing counsel to "file a no-merit brief" where "there is no issue of merit on which to base an argument for relief," provided counsel "identif[ies] any issues in the record on appeal that arguably support the appeal" and "state[s] why those issues lack merit or would not alter the ultimate result."). Counsel also informed Father in writing of

his right to file a *pro se* brief and explained how to do so.

Father's counsel identified two potential issues: (1) whether the trial court erred in terminating Father's parental rights because of his incarceration, and (2) whether the trial court abused its discretion in concluding that termination was in the children's best interests. We independently review the issues Father's no-merit brief raises. *In re L.E.M.*, 372 N.C. 396, 402, 831 S.E.2d 341, 345 (2019).

"[T]ermination of parental rights proceedings follow a two-step process": adjudication and disposition. *In re M.T.*, 285 N.C. App. at 319, 877 S.E.2d at 744. At adjudication, the petitioner must prove "by clear, cogent, and convincing evidence that one or more grounds for termination exist under [Section] 7B-1111(a)." *In re Z.A.M.*, 374 N.C. 88, 94, 839 S.E.2d 792, 797 (2020). If a ground exists, the court turns to disposition: whether "it is in the best interests of the juvenile to terminate parental rights." *Id.* We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent[,] and convincing evidence" and "the findings support the conclusions of law." *Id.* And we review the court's disposition for an "abuse of discretion." *Id.* at 95, 839 S.E.2d at 797.

We begin with the trial court's adjudication. A court may terminate parental rights for neglect under Section 7B-1111(a)(1) if the parent has neglected the juvenile under Section 7B-101. N.C. Gen. Stat. § 7B-1111(a)(1). A neglected juvenile includes one "whose parent, guardian, custodian, or caretaker does . . . not provide proper care, supervision, or discipline" or who "[c]reates or allows to be created a living

environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15) (2025).

The neglect must exist "at the time of the termination hearing." *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)). When "the child has been separated from the parent for a long period of time," the petitioner must prove both "past neglect" and "a likelihood of future neglect by the parent." *Id.* In examining whether future neglect is likely, the trial court must consider "evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re N.P.*, 374 N.C. 61, 63, 839 S.E.2d 801, 803 (2020) (citation omitted).

A parent's lengthy incarceration can support a finding of future likelihood of neglect, though not by itself. As our Supreme Court has explained, "[i]ncarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision"—but it "may be relevant to the determination of whether parental rights should be terminated." *In re J.S.*, 377 N.C. 73, 79, 855 S.E.2d 487, 492 (2021) (citation omitted). In *J.S.*, the Court held that the respondent's "lengthy incarceration"— extending "past the time his children [would] reach majority"—"implicate[d] a future likelihood of neglect," because he could not provide "proper care, supervision, or discipline" while incarcerated. *Id.* at 79–80, 855 S.E.2d at 493 (citations omitted). While "not the only factor," incarceration was a "relevant and necessary consideration in the trial court's finding of neglect." *Id.* at 80, 855 S.E.2d at 493 (citations omitted).

Here, the trial court made detailed findings of fact in the adjudication section of its termination order, relying in part on *J.S.* These findings focus largely on Father's role in Aaron's homicide, his lengthy incarceration, his disengagement from his children's lives, and his abuse of another child.

The trial court found, in relevant part:

> 18. [Respondents] have been incarcerated in jail and/or prison throughout the entirety of the case including presently.
>
> 19. The children have in fact been separated from [Respondents] since on or about [15 June 2023] . . . .
>
> . . . .
>
> 27. [Father] was convicted of second-degree murder on [26 September 2024] with the aggravating factors that it was especially cruel, the victim was especially young, and he reasonably knew or should have known that persons under the age of 18 could see and hear the offense. . . .
>
> 28. [Respondents'] convictions relate to [Aaron] and the other children being present during the death.
>
> . . . .
>
> 33. [Father] has never reached out to YFS to inquire about the wellbeing of his children including after [26 September 2024] which is when he was convicted, so even if he was concerned about speaking about the case, that was not a concern any longer. . . .
>
> . . . .
>
> 36. The projected release date for . . . [Father] is 2053.
>
> 37. [Respondents] lack insight into appropriate forms of punishment and discipline and proper care and supervision

in that despite [Aaron] pleading, being bruised and bloody, [Father] still engaged in bleeding, beating with a belt, grabbing him by the hair, engaging in a choke hold, and beating him with a club . . . .

38. The likelihood of repetition of neglect if the children return home is high. . . .

39. . . . [F]ather's release date is after the children reach the age of majority. The [c]ourt reviewed and considered the Supreme Court's holdings in *[In re] J.S.* . . . .

. . . .

41. The Supreme Court also looked at the history of violence and the long-term psychological effects of such exposure to the children in *[In re] J.S.*, and this [c]ourt finds that applies to these children as well. . . . [Father] has another young child that was adjudicated neglected due to abuse at the hands of [Father].

42. With no evidence being presented at the time of this hearing by [Father] that anything has changed and no testimony to demonstrate to the [c]ourt about what has changed for him that he would be able to provide proper care and supervision and discipline, the [c]ourt concludes that there is a likelihood of repetition of neglect for [Father].

These unchallenged findings support the trial court's conclusion that grounds existed for termination under Section 7B-1111(a)(1). *See In re Z.A.M.*, 374 N.C. at 94, 839 S.E.2d at 797.

Father's counsel's second issue is whether the trial court abused its discretion in concluding that terminating Father's parental rights was in the children's best interests. At the disposition stage, the court must "determine whether terminating the parent's rights is in the juvenile's best interest" based on:

(1) The age of the juvenile.

(2) The likelihood of adoption of the juvenile.

(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

N.C. Gen. Stat. § 7B-1110(a) (2025). The termination order included detailed findings on each factor. The court found that three-year-old Jensen and four-year-old Asher had been in YFS custody for nearly two years and in a foster home since December 2024, where "their needs are being met." They had "no parent-child bond" with Father, whom they had not seen in twenty-two months. The "likelihood of the juveniles being adopted [wa]s high"—their foster parents and the children's maternal great-aunt had both "expressed their desire to adopt." And termination would "aid in the accomplishment of the permanent plan of adoption," because "[n]o prospective adoptive home can adopt the juveniles unless [Respondents] consent to an adoption, or their parental rights are terminated."

The trial court did not abuse its discretion in concluding that terminating Father's parental rights was in the children's best interests. *See In re Z.A.M.*, 374 N.C. at 95, 839 S.E.2d at 797.

## IV.   Conclusion

Mother failed to present substantial evidence that the trial judge harbored personal bias or that circumstances would lead a reasonable person to question her impartiality.  And the trial court did not err in terminating Father's parental rights. We affirm.

AFFIRMED.

Judges HAMPSON and FREEMAN concur.

Report per Rule 30(e).